[No. 19978-5-II.   Division Two.   December 31, 1997.]

*In the Matter of the Marriage of* DAVID W. GILLESPIE, *Respondent*, and MARGARET L. LEWIS-GILLESPIE, *Appellant*.

*Bertha B. Fitzer*, for appellant.

*Michael J. Turner*, for respondent.

SEINFELD, J. — Margaret Lewis appeals the trial court's distribution of property and denial of spousal maintenance in this dissolution action. Her claims include a challenge to the trial court's characterization of the payment that her former husband received in exchange for a covenant not to compete. Finding the trial court's characterization and valuation proper, and no reversible error, we affirm.

## FACTS

David Gillespie and Margaret Lewis married in December 1987. Gillespie had three children from a former marriage and was an employee of Wheatland Insurance Center, Inc., in Oregon. Gillespie was also a shareholder and the president of Wheatland. Lewis had a bachelor's degree in business and psychology and approximately $100,000 in assets.

Eight months after the marriage, Gillespie sold his Wheatland stock and the couple relocated to Gig Harbor.

Wheatland agreed to pay $120,000 for Gillespie's shares and $80,000 for a covenant not to compete within a 50 mile radius for five years. It further agreed to pay $50,000 up front and the $150,000 balance plus interest in nine annual installments of approximately $25,000 each.

During the marriage, Lewis worked for a real estate company and completed a master's degree in psychology. Gillespie joined Persing, Dyckman & Toynbee, Inc. (PDT), an insurance sales agency in Tacoma. In December 1989, the couple purchased 755 shares of PDT stock for $116.56 per share. In 1992, Gillespie purchased an additional 293 shares for $137.54 per share. The annual payments for the 293 shares coincided with the $25,019 annual receipts under the Wheatland contract.

A June 1989 restrictive buy-sell agreement controlled any transfer of PDT shares. It stated:

> Each stockholder hereby agrees that, upon his or her death, permanent disability, retirement, or termination of employment with the corporation, his or her stock in the corporation shall be available for redemption by the corporation or purchased by the remaining stockholders in accordance with the [buy-sell agreement.]

The buy-sell agreement's formula for determining the aggregate value of the departing shareholder's shares required several adjustments to the gross income of the corporation, with the resulting figure divided by the number of shares issued and outstanding.

In December 1993, Douglas Dyckman, the majority shareholder, redeemed his shares. Gillespie then owned 33 percent of PDT's outstanding shares. As a result of the Dyckman redemption, the per share value of PDT stock under the buy-sell agreement rose dramatically to $446.25. This prompted the remaining shareholders to seek review of the allocation formula and amend the buy-sell agreement. The new formula excluded $301,668 from gross income; PDT then recalculated the per share value as of January 1994 from $446.25 to $310.63.

In early 1994, Lewis moved to Colorado because of health problems. In June 1994, Gillespie filed a petition for legal separation. At that time, his annual income was $161,000.

At the time of the separation, Lewis claimed that she suffered from numerous health problems that limited her ability to be fully employed. Those ailments included high blood pressure, depression, menopause, chronic sinusitis, headaches, hypertension and seasonal affective disorder. In November 1994, she disclosed the names of Dr. Cathy Luria[1] in Gig Harbor and Dr. Phillip Barr in Boulder, Colorado, in answer to an interrogatory asking for persons with knowledge regarding disabilities or illnesses that prevented her from "continuing, seeking, or obtaining full-time employment . . . ." She did not, however, provide a response to Gillespie's expert witness interrogatory.

The scheduled trial date for this case was April 1995. Due to a conflict in the court's schedule, the trial was continued to May 22 and, due to the unavailability of a courtroom and Lewis's absence, it was again rescheduled to July 17. On June 15, Lewis disclosed that she intended to call Barr, Luria, and Donna Duckman as expert medical witnesses at trial. Barr and Duckman would testify that Lewis was unable to work; Luria and Duckman would testify about her physical and psychological conditions.

On June 30, Gillespie moved for a protective order and to exclude the testimony of the recently disclosed health care experts. On July 17, the court granted Gillespie's motion because of Lewis's untimely disclosure of witnesses.

Meanwhile, on June 29, Gillespie had disclosed Cary Deaton as an expert rebuttal witness, and on July 6, Gillespie informed Lewis of the nature of Deaton's testimony. On July 7, Lewis moved to exclude Deaton's testimony. The court denied the motion.

At the time of trial, Gillespie and Lewis were 48 and 47 years of age respectively. Gillespie had a $482 per month support obligation for his 17-year-old daughter. He also had

---

[1]Cathy Luria was variously referred to in the record as "Dr." and as an "R.N."

an obligation to provide postsecondary education support for her.

The then remaining principal balance under the Wheatland contract was $44,012.65. Lewis argued that the Wheatland contract, especially the covenant not to compete, was community property and that, in any event, Gillespie had commingled the contract payments by depositing them in a community bank account. Gillespie claimed the Wheatland contract as his separate property and argued that the 1993 and 1994 payments were traceable to a subsequent stock purchase he made. The trial court concluded that the Wheatland contract was Gillespie's separate property, but awarded it to Lewis.

Gillespie also claimed the 293 PDT shares as separate property. Lewis claimed they were community property because (1) payments were made from a bank account containing community funds; (2) the Wheatland contract receipts were commingled with community funds and no longer traceable; and (3) she approved of the investment as a community obligation despite her desire to invest her separate property elsewhere. The trial court concluded that the 293 shares were Gillespie's separate property.

Lewis introduced the expert testimony of Frank Ault, a CPA and specialist in small business valuations, to value the PDT stock. Using three different accounting formulas, he concluded that Gillespie's shares were worth $757.73 per share. In reaching his conclusion, Ault considered the buy-sell agreement, and the minority value and closely held corporation discounts. He did not, however, deduct a minority/liquidity discount *after* determining the value of the corporation as a whole.

Gillespie used Dyckman as his expert witness regarding the buy-sell agreement and Deaton as a rebuttal expert witness. Deaton did not do an independent evaluation. Instead, he challenged Ault's failure to reduce the share value of Gillespie's holdings based on minority interest and lack of liquidity factors. The court valued the parties' 1,048 shares of PDT stock at $331.23, rejecting Ault's valuations

and accepting Dyckman's testimony that the buy-sell agreement had consistently been used as the basis for valuing PDT stock.[2]

The court also considered the characterization of a condominium in Boulder, Colorado that was purchased for $28,000 in both parties' names. Lewis testified that the $2,500 down payment was made with money she received from her parents and that she placed title in both names to obtain financing. Gillespie testified that the community contributed perhaps $500 toward the down payment. The court concluded that the condominium was community property and accepted Gillespie's $60,000 valuation less the $23,000 owing on it for a net community asset of $37,000. Lewis also owned a duplex in Colorado, which the court determined had an equity value of $74,000.

On appeal, Lewis challenges the trial court's property distribution, claiming that the court improperly characterized and valued certain property. She also challenges the denial of her request for maintenance, arguing that the exclusion of her expert witnesses denied her the opportunity to show need.

I

PROPERTY DISTRIBUTION

Lewis claims that the trial court mischaracterized (1) the Wheatland contract; (2) the 293 shares of PDT stock; and (3) the Colorado condominium.

■ ■ A party challenging a property distribution must demonstrate that the trial court manifestly abused its discretion. *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984); *In re Marriage of Terry*, 79 Wn. App. 866, 869, 905 P.2d 935 (1995). We find a manifest abuse of discretion when the trial court exercises its discre-

---

[2]The court added $20.60 to the recalculated per share value of $310.63 to reflect the assessed value of real property owned by PDT.

tion on untenable grounds. *In re Marriage of Olivares*, 69 Wn. App. 324, 328, 848 P.2d 1281 (1993).

In a dissolution action, the trial court must make a "just and equitable" distribution of the property and liabilities of the parties after considering all relevant factors, including the nature and extent of the separate and community properties and the duration of the marriage. RCW 26.09.080. The trial court's paramount concern when distributing property in a dissolution action is the economic condition in which the decree leaves the parties. *In re Marriage of Williams*, 84 Wn. App. 263, 270, 927 P.2d 679 (1996), *review denied*, 131 Wn.2d 1025 (1997); RCW 26.09.080.

The court may consider the health and ages of the parties, their prospects for future earnings, their education and employment histories, their necessities and financial abilities, their foreseeable future acquisitions and obligations, and whether ownership of the property is attributable to the inheritance or efforts of one or both spouses. *Olivares*, 69 Wn. App. at 329-30 (citing *Friedlander v. Friedlander*, 80 Wn.2d 293, 305, 494 P.2d 208 (1972)).

In considering the factors set forth in RCW 26.09.080, the trial court has a duty to characterize the property as either community or separate, as of the date of its acquisition. *Olivares*, 69 Wn. App. at 329 (citing *In re Marriage of Hadley*, 88 Wn.2d 649, 656, 565 P.2d 790 (1977)); *Baker v. Baker*, 80 Wn.2d 736, 745, 498 P.2d 315 (1972). To accomplish this the court may consider the source of the property and the date of acquisition. *Olivares*, 69 Wn. App. at 329. Although failure to properly characterize property may be reversible error, mischaracterization of property is not grounds for setting aside a trial court's property distribution if it is fair and equitable. *In re Marriage of Shannon*, 55 Wn. App. 137, 140, 777 P.2d 8 (1989).

The law will not convert property acquired before marriage into community property, absent a writing evidencing the mutual intent of the parties. *Shannon*, 55

Wn. App. at 140. Property acquired during marriage is presumed to be community property, unless this presumption is rebutted by clear and convincing evidence. *Olivares*, 69 Wn. App. at 331. Where there is any uncertainty in tracing an asset to a separate property source, the law resolves the uncertainty in favor of a finding of community character. *See Connell v. Francisco*, 127 Wn.2d 339, 351, 898 P.2d 831 (1995).

## A. Characterization

■■ The Wheatland contract, the PDT stock, and the condominium all were acquired during marriage; thus, the presumption of community property applies unless the particular property was derived from a separate property source. *Olivares*, 69 Wn. App. at 331; RCW 26.16.010. But the subject of the Wheatland contract was the ownership interest in Wheatland that Gillespie had acquired before marriage. Thus, the proceeds of the sale were his separate property. RCW 26.16.010.

Nonetheless, Lewis argues that we should treat the covenant not to compete as community property because the noncompetition obligation was fulfilled during marriage. Where a covenant not to compete limits the covenantee's behavior after a marriage is dissolved, it "is the separate property of the covenantee because it restricts the covenantee's future conduct." *In re Marriage of Monaghan*, 78 Wn. App. 918, 927, 899 P.2d 841 (1995); *see also Lucas v. Lucas*, 95 N.M. 283, 621 P.2d 500, 502 (1981). But we find no controlling authority as to whether a noncompetition agreement, under the facts here, is separate or community.

■ Contrary to Lewis's argument, policy reasons support treating the agreement as separate. There might be a compelling reason to treat the noncompetition payments as community where they replace income that the community otherwise would have received from the covenantee's labor. But where, as here, the community relocates and the covenantee successfully replaces the income that he had the potential to earn, but for the noncompetition agree-

ment, with substitute earnings that greatly exceed those he gave up, there is no demonstrated detriment to the community from the noncompetition agreement.

Under the facts of this case, the noncompetition agreement had no impact on Gillespie's earning capacity during the marriage. As the trial court noted,

> It didn't bind or it didn't hurt the community in any way, shape, or form. He came up here and made two to three times the money, because the highest money he earned down there was $50,000 or $50-plus thousand. And, at least by his last year here, he was $161,000. So he earned three times that amount.

Further, the community would receive an unfair windfall were we to characterize these funds as community. The noncompetition payments recognize Gillespie's contribution to Wheatland over an extended premarital period of time. As the contract states, the consideration for the noncompetition provision "is being paid . . . because Gillespie has had a close relationship with many of the clients of Wheatland and in the past has left the Pendleton, Oregon area and returned to re-enter the insurance business." If those payments were characterized as a community asset, the community would receive the benefits of Gillespie's efforts during marriage and, in addition, payment for his separate efforts before marriage.

For the above reasons, we conclude that the payments here were Gillespie's separate property. In doing so, we specifically do not decide whether payments for a noncompetition agreement that replace community earnings are a separate or community asset.

Lewis further argues that Gillespie commingled the Wheatland receipts so that they were no longer traceable when he purchased the 293 shares of PDT stock. Thus, she argues, even if the Wheatland contract was Gillespie's separate property, the PDT shares were community. But there is substantial evidence in the record to support the trial court's conclusion that proceeds from the Wheatland

contract were directly traceable to Gillespie's purchase of the 293 shares of PDT stock. Thus, the trial court did not abuse its discretion in characterizing the 293 shares of PDT as Gillespie's separate property.

There also is substantial evidence to support the trial court's characterization of the Colorado condominium as a community asset. Apparently the rental income was sufficient to make the mortgage payments. The determinative factors, therefore, were the intent of the parties and the characterization of the down payment. The trial court heard evidence that the residence was in both parties' names; that some community money was used for part of the down payment; and that Gillespie's signature and credit information appeared on the loan application. Given this evidence, the court did not err by resolving any uncertainty in favor of a finding of community property. *See Connell*, 127 Wn.2d at 351.

*B. Valuation*

Lewis challenges the trial court's valuation of the PDT stock and the Colorado condominium and duplex.

It is difficult to value the shares of a closely held corporation; the task calls for the careful weighing of relevant facts and the ultimate exercise of reasoned judgment. *In re Marriage of Berg*, 47 Wn. App. 754, 756-57, 737 P.2d 680 (1987). In a dissolution proceeding, the court should consider a restrictive buy-sell agreement among shareholders, but it is not a determinative factor. *Suther v. Suther*, 28 Wn. App. 838, 847, 627 P.2d 110 (1981). The trial court must include in the record its method of valuation and the weight it gave to the factors it considered. *Berg*, 47 Wn. App. at 757.

Relying on *Suther*, Lewis argues that the trial court improperly bound her to the buy-sell agreement, which she did not sign and which was amended after the date of separation. In *Suther*, the husband, who owned 50 percent of the shares of a close corporation, appealed the trial

court's valuation of his shares. He asserted that the stock retirement agreement bound the court to value the corporate stock at its book value, excluding goodwill. *Suther*, 28 Wn. App. at 842. The appellate court disagreed, finding that an uninformed and nonparticipatory spouse was not bound in a dissolution action by an agreement among shareholders of a closely held corporation. The *Suther* court did not preclude a trial court from relying upon a buy-sell agreement; rather it indicated that a trial court has discretion to consider other factors in assessing the value of a closely held business. 28 Wn. App. at 846-47.

▮▮ ▮▮ Because the trial court's valuation of the parties' shares in PDT, as well as the real estate, was a factual issue, we review the trial court's determinations for an abuse of discretion. *See Suther*, 28 Wn. App. at 839-40. Here, the trial court heard the testimony of Dyckman, Gillespie, Ault, and Deaton as to value. It reviewed numerous exhibits including the buy-sell agreement, the financial statements of PDT, records of previous stock transactions, and the written valuation formulas employed by Ault.

The court stated in its oral decision the reasons for its determination and the factors it considered. It did not accept Ault's valuations because of the apparent absence of a discount for Gillespie's minority interest and the lack of liquidity. Given that Curtis Dyckman, Douglas Dyckman's son, was the owner of 53 percent of the shares, it was unlikely that Gillespie's minority owner status would change in the future. *See In re Marriage of Harrington*, 85 Wn. App. 613, 636, 935 P.2d 1357 (1997) (proper to eliminate minority discount where there is evidence that minority owner soon would obtain control of the business). Nor was there evidence that PDT was going to be sold as a going concern in the near future. It was reasonable to conclude that if Gillespie were to sell his shares, he would do so according to the formula in the buy-sell agreement. Thus, the trial court did not abuse its discretion in valuing the PDT stock as it did.

Lewis contends that the trial court's valuation of the

condominium and the Colorado duplex was too high. The trial court based its $60,000 figure for the condominium, $32,000 above the 1989 purchase price, upon a market analysis that Gillespie provided. The $285,000 figure for the duplex, which was $45,000 above the 1994 contract price, also was based upon Gillespie's testimony. Gillespie relied upon a market appraisal by real estate professionals in Boulder. Lewis, who had looked at advertised real estate prices, contended that real estate prices had dropped significantly in Colorado. She did not, however, provide an appraisal.

In determining whether substantial evidence exists to support a court's finding of fact, the record is reviewed in the light most favorable to the party in whose favor the findings were entered. *DeBenedictis v. Hagen*, 77 Wn. App. 284, 291, 890 P.2d 529 (1995). Under this standard, there was substantial evidence to support the trial court's valuation of the duplex and condominium.

## II

## EXPERT WITNESSES

The trial court has discretionary authority to exclude an expert's testimony as a sanction for a party's failure to timely provide supplementary responses to interrogatories. *M/V La Conte, Inc. v. Leisure*, 55 Wn. App. 396, 402, 777 P.2d 1061 (1989). An appellate court will not disturb the decision to use this sanction absent an abuse. *Lampard v. Roth*, 38 Wn. App. 198, 202, 684 P.2d 1353 (1984).

When the decision to exclude testimony stems, not from a willful violation of a court order, but from the fact that a witness was not disclosed until just before or during trial, prejudice to the other side is relevant. *Miller v. Peterson*, 42 Wn. App. 822, 825, 714 P.2d 695 (1986). The following considerations, referred to as the *Barci* factors, are a useful guide in deciding whether to exclude or allow

testimony from a witness who was undisclosed until just before trial:

> (a) the presence or absence of good faith attempts by the proponent of the witness to comply with the rules of discovery, (b) the availability or discoverability of the witness at an earlier time, (c) the circumstances of the proponent at the time of the securing of the witness, *i.e.*, whether a physical injury or illness had progressed to a point where diagnosis and/or prognosis was possible and/or whether the passage of time had made the consequences of the acts of the parties discernible to an expert witness at an earlier time, (d) the materiality of the proposed testimony to the proponent, (e) the extent of surprise to the opponent, (f) the availability of opportunity to the opponent to depose the witness, (g) the availability of opportunity to the opponent to prepare for cross-examination, (h) the opportunity to the opponent to secure contradicting witnesses, (i) the prejudice presented to a proponent or opponent's case if a continuance is granted, (j) the impact upon both parties of the expenses of delay, and (k) the ability of an imposition of costs upon a proponent to remedy any hardship imposed upon an opponent by the late calling of a witness.

*Miller*, 42 Wn. App. at 825 (quoting *Barci v. Intalco Aluminum Corp.*, 11 Wn. App. 342, 349-50, 522 P.2d 1159 (1974)).

In *Miller*, a medical malpractice action, the trial judge struck the testimony of three experts whom the defendant disclosed within days of trial. 42 Wn. App. 824-25. The reviewing court cited no unconscionable conduct or violation of a court order. But it found that other *Barci* factors weighed heavily in favor of exclusion, the most important being the prejudice to the defendant from a continuance. *Miller*, 42 Wn. App. at 825-26. The *Miller* court stated: "[W]hile in many instances a continuance is an appropriate remedy when one party springs a surprise witness, in this case it was not." 42 Wn. App. at 826. The plaintiff was 83 years old at the time of trial and the parties had stipulated to an early trial date. *Miller*, 42 Wn. App. at 826.

Here, there is no indication of a willful violation of a

court order. Thus, we consider the possible prejudice to Gillespie from a continuance or from allowing the witnesses to testify. As in *Miller*, several *Barci* factors weigh heavily in favor of exclusion. Lewis cannot claim a good faith attempt to comply with the rules of discovery when she did not disclose her expert witnesses until two previously scheduled trial dates had passed. Given her long-standing medical ailments, Lewis should have known at a much earlier date that these witnesses could provide helpful expert testimony.

Further, two of the witnesses resided in Colorado. This would have made it difficult and costly for Gillespie's attorney to depose them at that late date. And it is likely that yet another continuance of the trial would have been necessary if Gillespie needed to secure his own medical witness. Because of the potential prejudice to Gillespie, we cannot say that the trial court lacked justification for its ruling or abused its discretion in excluding the medical witnesses.

Lewis claims that to be evenhanded, the trial court should have excluded Gillespie's rebuttal witness because of his late disclosure. But Gillespie did not violate any court-ordered discovery deadline. Nor does Lewis assert any prejudice based upon the *Barci* factors. Her attorney deposed Deaton on July 13 and had the opportunity to prepare for cross-examination. Thus, she cannot claim surprise. The trial court did not abuse its discretion in allowing Deaton to testify.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

ARMSTRONG and HUNT, JJ., concur.