IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

In re the Marriage of:           )
                                     )
                                     )     No. 30459-1-III
DANEILLE DICKSON,          )
                                     )
        Respondent,        )
                                     )
        and                 )     UNPUBLISHED OPINION
                                     )
CRAIG DICKSON,            )
                                     )
        Appellant.         )

FEARING, J. — In this marriage dissolution proceeding, the trial court ordered Craig Dickson to pay maintenance to Daneille Dickson, child support and private school tuition for the couple's minor child, all postsecondary expenses for the couple's college age child, a property equalization payment, and a portion of Ms. Dickson's attorney fees. Mr. Dickson assigns six errors to the rulings of the trial court. He contends the trial court (1) failed to properly consider the statutory factors in calculating maintenance, (2) wrongly set child and postsecondary support amounts, (3) neglected to consider his separate property contribution to the family home, (4) failed to apply credit for retroactive payments, (5) failed to take into account the business assets seized by the federal government in dividing the parties' property, and (6) wrongly ordered him to pay

a portion of Ms. Dickson's attorney fees. After a two-week trial but before the trial court's ruling, the Federal Bureau of Investigation (FBI) seized assets of the couple as the result of Mr. Dickson's criminal "structuring" activity. The seizure complicated the issues to be resolved, and the trial court thereafter convened an additional week of trial.

## FACTS

The Dicksons married on July 6, 1991. They have two children: Jordan (age 21) and Regan (age 18). Ms. Dickson has only a high school education and stayed at home to care for the children during much of the marriage. Mr. Dickson holds a college degree. Ms. Dickson petitioned for dissolution on August 10, 2009.

Mr. Dickson received an inheritance from his mother's estate in 2002. Mr. Dickson claims that the parties used $200,000 of the inheritance for a down payment on a family home. Ms. Dickson testified she was unaware the down payment came from an inheritance.

Most of the parties' assets were acquired by income generated by their successful business, Dickson Iron & Metals, Inc. (DI&M), which resells scrap metal. Mr. Dickson, however, failed to produce in discovery or at trial income tax returns for the two years preceding trial. In November 2008, Ms. Dickson opened Rogue, a coffee shop, but it failed and closed less than a year later.

At the time of dissolution, Jordan was a sophomore attending Whitman College. His annual tuition is $50,000 per year. Regan was a junior at a private high school in

2

Colorado, where her mother relocated. Her annual costs for tuition and fees approximate $15,000.

Trial proceeded in mid-July 2010. During trial, expert appraisers testified as to the value of DI&M. Ms. Dickson's expert, Douglas Brajcich, employed a capitalized excess earnings method of valuation and valued DI&M at $3 million. Mr. Dickson's expert, Dan Harper, testified that a straight capitalization accounting methodology was a more appropriate method to value the scrap metal business. Mr. Harper appraised DI&M as being worth between $1,494,153 and $1,642,675.

On August 31, 2010, after trial but before the trial court entered final orders on the petition for dissolution, the FBI raided DI&M, Mr. Dickson's residence, and the family residence occupied by Ms. Dickson. The FBI seized cash, the account balances in DI&M bank accounts, business records of the company, and personal vehicles. On August 31, the FBI also seized, from Mr. Dickson, checks made payable to DI&M, totaling $448,470. Dickson carried the checks in a duffle bag on his way to work. The checks were dated from the middle of July 2010 through the fourth week of August 2010.

Eventually the federal government charged Mr. Dickson with structuring financial transactions to avoid reporting requirements and conspiracy to commit structuring based on DI&M business practices from January 1, 2005 through April 30, 2008. The government alleged that Mr. Dickson laundered stolen scrap metal for thieves and tried to keep the transactions hidden. In March 2011, Mr. Dickson pled guilty to seven counts of

structuring financial transactions and one count of conspiracy to commit the same offense. Mr. Dickson and the government entered into a plea agreement whereby Mr. Dickson forfeited real property, vehicles, and retirement accounts. He also agreed to pay a money judgment.

During the forfeiture proceedings, Ms. Dickson asserted she was an innocent owner and had a superior interest to some of the seized assets. On July 6, 2011, Ms. Dickson entered into a stipulation with the federal government, under which the government paid her $15,000 and returned to her a Lexus and a BMW. In exchange, Ms. Dickson released all other claims to the forfeited assets.

At the request of Mr. Dickson, the trial court reopened the trial for presentation of additional evidence resulting from the FBI seizures. The dissolution trial resumed on July 13, 2011, and continued until July 20, 2011. During the reconvened trial, Mr. Dickson testified that he had not deposited the $448,470 in checks seized by the government because he had a "pile of paperwork coming out of trial." Report of Proceedings (RP) at 1909.

After completion of trial, the trial court dissolved the parties' marriage and ordered Mr. Dickson to pay $6,500.00 per month in maintenance from September 1, 2011, to August 31, 2013. The court ordered Mr. Dickson to pay $1,257.60 per month in child support for Regan, all of Jordan's educational expenses for the next three years, and Regan's private school expenses up to $15,000.00 per school year for two years. On the

4

child support worksheet, the court calculated Mr. Dickson's net monthly income at $12,303.00 and Ms. Dickson's net monthly income at $5,725.62, based upon the maintenance award. Also on the child support worksheet, the court used the figure for a one-child household, even though Mr. Dickson was ordered to pay postsecondary support for Jordan. In dividing the couple's property, the trial court awarded the $317,121.27 proceeds from the sale of the family home to Ms. Dickson, finding the $200,000.00 down payment from Mr. Dickson's inheritance was commingled and, thus, community property. The trial court estimated the value of the seized property, cash, and vehicles to be $1,358,763.00. The court counted the assets seized by the government as assets awarded to Mr. Dickson. In other words, only Mr. Dickson was burdened, in the trial court ruling, by the seizure.

The court valued DI&M at $2,500,000.00 and awarded the business to Mr. Dickson. The court ordered him to pay Ms. Dickson an equalization payment of $2,012,059.50. The distribution and equalization payment resulted in each party receiving distribution of $2,888,774.50. The court ordered Mr. Dickson to pay $59,047.00 in Ms. Dickson's attorney fees and costs. The court allowed these fees to be deducted from the equalization payment, reducing the equalization payment to $1,953,012.50 with an interest rate of 12 percent per annum.

LAW AND ANALYSIS

ISSUE I. Maintenance

The trial court granted Ms. Dickson $6,500 per month for two years beginning September 2011. On appeal, Mr. Dickson argues the maintenance amount is unjust and contrary to RCW 26.09.090 for various reasons. According to Mr. Dickson, the parties did not have a long-term marriage. Ms. Dickson has marketable skills. Ms. Dickson is financially able to provide for herself and is supported by her cohabitating boyfriend. She continues to live the same, if not better, lifestyle. Mr. Dickson does not have the ability to pay. Mr. Dickson claims legal error because the trial court refused to consider the income of Ms. Dickson's boyfriend as support to Ms. Dickson before assessing spousal maintenance upon Mr. Dickson.

RCW 26.09.090 controls awards of spousal maintenance. The statute reads, in relevant part:

> (1) In a proceeding for dissolution of marriage . . . , the court may grant a maintenance order for either spouse . . . . The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to:
>     (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
>     (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;

6

(c) The standard of living established during the marriage or domestic partnership;

(d) The duration of the marriage or domestic partnership;

(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

We review the trial court's decision on an award of maintenance for abuse of discretion. *In re Marriage of Zahm*, 138 Wn.2d 213, 226-27, 978 P.2d 498 (1999). "An award of maintenance that is not based upon a fair consideration of the statutory factors constitutes an abuse of discretion." *In re Marriage of Crosetto*, 82 Wn. App. 545, 558, 918 P.2d 954 (1996). Ultimately, the court's main concern must be the parties' economic situations postdissolution. *In re Marriage of Williams*, 84 Wn. App. 263, 268, 927 P.2d 679 (1996). "The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of relevant factors, the award must be just." *In re Marriage of Bulicek*, 59 Wn. App. 630, 633, 800 P.2d 394 (1990).

The record establishes that the trial court explicitly considered each factor in its oral ruling and findings of fact before ruling that Ms. Dickson had a need for maintenance and Mr. Dickson had the ability to pay. The Dicksons were married for 19 years, a sufficient duration to warrant maintenance. Ms. Dickson only has a high school education while Mr. Dickson has a college decree. Ms. Dickson spent the majority of the

parties' marriage at home performing the noble role of mom. Her homemaking provided time and opportunity for Mr. Dickson to establish a successful family business that provided an abundant lifestyle for the family. Ms. Dickson was accustomed to this lifestyle.

Washington decisions show the trial court did not abuse its discretion. In *In re Marriage of Fernau*, 39 Wn. App. 695, 705, 694 P.2d 1092 (1984), the court affirmed a maintenance award when the parties were married 9 years. In *In re Marriage of Myers*, 54 Wn. App. 233, 773 P.2d 118 (1989), this court affirmed a 5-year maintenance award following the dissolution of a 12-year marriage.

Mr. Dickson fails to identify any authority requiring a trial court to consider the income of a spouse's cohabitating friend when resolving maintenance. Such income is not a factor listed in RCW 26.09.090(1).

The trial court has discretion to weigh the relevant statutory factors and circumstances of the case, and we do not substitute our judgment for that of the trial court. *Zahm*, 138 Wn.2d at 227. We uphold the award of spousal maintenance.

ISSUE II. Child Support

The trial court set child support at $1,257.60 per month for Regan and ordered Mr. Dickson to pay all of Regan's private school tuition and all of Jordan's postsecondary support. Mr. Dickson assigns three errors to the trial court's award of child support. First, according to Dickson, the court order exceeds 45 percent of his net income, which

is impermissible under RCW 26.19.065(1). Second, the court failed to impute income to Ms. Dickson. Third, the court erred in calculating child support for Regan based on a one-child family when Mr. Dickson provides support for two children. We agree with Mr. Dickson's third contention.

Child support, extraordinary expenses, and postsecondary support orders are all reviewed for abuse of discretion. *In re Marriage of Griffin*, 114 Wn.2d 772, 776, 791 P.2d 519 (1990); *Childers v. Childers*, 89 Wn.2d 592, 601, 575 P.2d 201 (1978). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). Substantial evidence must support the trial court's factual findings. *In re Parentage of Goude*, 152 Wn. App. 784, 790, 219 P.3d 717 (2009). This court will not substitute its judgment for trial court judgments if the record shows the court considered all relevant factors and the award is not unreasonable under the circumstances. *Griffin*, 114 Wn.2d at 776.

RCW 26.09.100(1) requires the trial court, after considering "all relevant factors," to order either or both parents to pay child support in an amount determined under chapter 26.19 RCW. The trial court calculates the total amount of child support, allocates the basic support obligation between the parents based on each parent's share of the combined monthly net income, RCW 26.19.080(1), then orders the parent with the greater obligation to pay the other a support transfer payment. RCW 26.19.011(9).

9

RCW 26.19.065(1) reads:

(1)  Limit at forty-five percent of a parent's net income.  Neither parent's child support obligation owed for all his or her biological or legal children may exceed forty-five percent of net income except for good cause shown.

. . . .

(b)  Before determining whether to apply the forty-five percent limitation, the court must consider whether it would be unjust to apply the limitation after considering the best interests of the child and the circumstances of each parent.  Such circumstances include, but are not limited to, leaving insufficient funds in the custodial parent's household to meet the basic needs of the child, comparative hardship to the affected households, assets or liabilities, and any involuntary limits on either parent's earning capacity including incarceration, disabilities, or incapacity.

(c)  Good cause includes, but is not limited to, possession of substantial wealth, children with day care expenses, special medical need, educational need, psychological need, and larger families.

The court calculated Mr. Dickson's net monthly income as $12,303.  While Mr. Dickson testified his wages were only $10,000 per month at the time of trial, he provided no proof of this amount.  Without proof of more recent earnings, the court calculated earnings based on 2006 through 2008 tax records, which showed Mr. Dickson's wages were respectively $235,000, $283,000, and $335,720.  These tax returns provide sufficient evidence that Mr. Dickson's net monthly income is $12,303.  Accordingly, the trial court did not abuse its discretion.

We must next determine the amount of child support paid by Mr. Dickson each month to determine if the amount exceeds 45 percent of his net monthly income.  Division Two of this court examined the meaning of "child support" under RCW

10

26.19.065(1). *In re Marriage of Cota*, 177 Wn. App. 527, 312 P.3d 695 (2013). The court concluded that postsecondary educational support "is money paid to support a dependent child, therefore it is child support" for purposes of the 45 percent limitation. *Cota*, 177 Wn. App at 541 (quoting *In re Marriage of Schneider*, 173 Wn.2d 353, 368, 268 P.3d 215 (2011)). The court relied upon the Supreme Court decision in *Schneider*. In *Schneider*, the court explained "that postsecondary educational support . . . fits within the structure of the child support statute in general [and in some situations] can function just like ordinary child support." *Schneider*, 173 Wn.2d at 368. Therefore, we hold that tuition Mr. Dickson pays for both Jordan and Regan is included in his "child support obligations" for purposes of RCW 26.19.065(1).

The court ordered Mr. Dickson to pay $1,257.60 per month in ordinary child support for Regan, all of Jordan's educational expenses of $50,000.00 annually for the next three years, and Regan's private school expenses up to $15,000.00 per school year for two years. Jordan's educational expenses are $4,166.00 per month; while Regan's school expenses are $1,250.00 per month. The support totals $6,673.60 per month. Forty-five percent of Mr. Dickson's net monthly income of $12,303.00 is $5,536.35, so the monthly payment exceeds the 45 percent limit by $1,137.25.

RCW 26.19.065(1)(c), however, permits a court to exceed the 45 percent cap "for good cause shown," including for "educational need" or when one party possesses "substantial wealth." In his written findings of fact and conclusions of law, the trial court

11

found Jordan and Regan possessed an educational need for support and that Craig possessed substantial wealth. On a motion to reconsider, the trial court found "[c]urrent postsecondary and child support amounts reflect a significant deviation which remains supported by good cause." Clerk's Papers (CP) at 1060. We conclude that the trial court did not abuse its discretion in exceeding the 45 percent limit.

Mr. Dickson next argues the court erred by failing to impute income to Ms. Dickson when calculating child support. At the time of the decree, Ms. Dickson was 40 years old, with a high school education, and without significant marketable skills. At the time of trial, Ms. Dickson was unemployed and had no recent work history or education that would mandate an imputation of income. The coffee shop she opened quickly failed. The trial court did not abuse its discretion when it chose not to impute income to her, but instead attributed the spousal maintenance to her as income. The maintenance amount is in an amount higher than whatever income Ms. Dickson may later gain. Mr. Dickson argues the court should have factored in Ms. Dickson's boyfriend's income, but income and resources of a new spouse or domestic partner are specifically "excluded" in calculating the parent's gross monthly income. RCW 26.19.071(4).

Mr. Dickson next argues that the court should have awarded child support on the basis of a two-child, not a one-child family. If the court used the figures for a two-child family, the total child support obligation would be reduced from $1,844 to $1,440 for

Regan. Jordan was no longer the subject of child support, since he received postsecondary education support.

Chapter 26.19 RCW directs a specific process a trial court must follow before entering an order of child support. The first step is to set the basic child support obligation based on the parents' combined monthly net income and the number and ages of the children. RCW 26.19.011(1), .020; *In re Marriage of McCausland*, 159 Wn.2d 607, 611, 152 P.3d 1013 (2007). The obligation amount is determined from an economic table. RCW 26.19.020. The per child amount is reduced with multiple children in the family. RCW 26.19.020. When the combined monthly income of both parents exceeds $12,000 the court "may exceed the presumptive amount of support set for combined monthly net incomes of twelve thousand dollars." RCW 26.19.020.

Our trial court used the economic table to calculate the basic support obligation for Regan at $1,844.00. This is the highest amount for a one-child family, with parents having a combined monthly income of $12,000.00. Mr. Dickson's portion of the child support obligation was $1,257.60. Ms. Dickson argues this was a deviation because the parties' combined monthly income is over $12,000.00, thus, the court could set any amount it wanted. But, the court listed as the "Reason[s] why Request for Deviation Was Denied" was because Mr. Dickson was "independently provid[ing] funds directly to each child." CP at 804. Evidence showed that Mr. Dickson gave Regan $1,500.00 per month directly and the court wanted the funds to be paid to Ms. Dickson instead. Using the

13

presumptive amount resulted in Mr. Dickson paying the approximate amount that he paid before dissolution. Thus, the court did not intend a deviation.

Another division of our court recently addressed a similar situation, in *Cota*, 177 Wn. App. 527. The court held, "[W]e believe that our Supreme Court's statement that postsecondary educational support is child support controls here. Therefore, we hold that postsecondary educational support is part of a parent's 'child support obligation.'" *Cota*, 177 Wn. App at 542 (citing *Schneider*, 173 Wn.2d at 367-68). In *Daubert*, the court held, "when calculating support for the younger minor children, the schedule applies and requires consideration of the postsecondary child, because this child is still a child receiving support." *In re Marriage of Daubert*, 124 Wn. App. 483, 503, 99 P.3d 401 (2004), *abrograted on other grounds* by *McCausland*, 159 Wn. 2d 607. The *Daubert* court ultimately reversed the award of child support for the youngest child and remanded "for recalculation based on two children receiving support." *Id.* at 506.

Mr. Dickson pays child support for Regan and postsecondary support for Jordan. Because the trial court intended to rely on the economic table and because both children received support, the trial court should have relied on the column for a two-child family. As set forth in *Daubert*, the proper recourse is to remand for recalculation based on two children receiving support.

ISSUE III. Tuition Expenses for Regan

Mr. Dickson next contends the trial court erred when ordering him to pay Regan's

14

entire private school tuition. RCW 26.19.080(3) provides Mr. Dickson solace and reads, in part, "[S]pecial child rearing expenses, such as tuition . . . are not included in the economic table. These expenses shall be shared by the parents in the same proportion as the basic child support obligation." But, under subsection (4), "The court may exercise its discretion to determine the necessity for and the reasonableness of all amounts ordered in excess of the basic child support obligation."

As a result of the mandatory language in RCW 26.19.080(3), early cases held that a trial court must allocate special expenses in the same proportion as the child support obligation. *Murphy v. Miller*, 85 Wn. App. 345, 349, 932 P.2d 722 (1997); *In re Paternity of Hewitt*, 98 Wn. App. 85, 988 P.2d 496 (1999); *In re Marriage of Scanlon*, 109 Wn. App. 167, 34 P.3d 877 (2001). Beginning with Division Two in *In Re Marriage of Casey*, 88 Wn. App. 662, 967 P.2d 982 (1997), courts have recognized an exception to proportionate allocation for extraordinary expenses. Thus, the trial court is not always bound to comply with the restrictions of RCW 26.19.080(2). *In re Marriage of McCausland*, 129 Wn. App. 390, 411, 118 P.3d 944. Findings must support any requirement that a parent bear the full cost of any extraordinary expenses. *McCausland*, 129 Wn. App. at 411.

Our trial court found in its oral ruling that Regan is "a delightful student" and "going to be exploring all of the other opportunities that may be presented in Highlands Ranch, Colorado, which is the site of her new school Valor Christian." RP at 2051. The

15

court also found, "Because the children's needs are very closely related to their education, dad should be responsible for their schooling." RP at 2052. Mr. Dickson has solely paid Regan's expenses in the past. Notably, Ms. Dickson's income is limited to maintenance. Although we may prefer more thorough findings, we conclude the trial court acted within its discretion when ordering Mr. Dickson to pay the entire tuition of his daughter.

ISSUE IV. Postsecondary Support for Jordan

RCW 26.19.090(2) gives the trial court discretion to order support for postsecondary educational expenses and sets forth criteria the trial court should consider when making such an award. The trial court initially must find that the child is dependent and "relying upon the parents for the reasonable necessities of life." RCW 26.19.090(2). Once that threshold requirement is satisfied, the trial court must also consider the following nonexhaustive list of factors:

> Age of the child; the child's needs; the expectations of the parties
> for their children when the parents were together; the child's prospects,
> desires, aptitudes, abilities or disabilities; the nature of the postsecondary
> education sought; and the parents' level of education, standard of living,
> and current and future resources.

RCW 26.19.090(2). "Also to be considered are the amount and type of support that the child would have been afforded if the parents had stayed together." RCW 26.19.090(2). We presume that the court considered all evidence before it in fashioning an order on

16

postsecondary educational expenses. *In re Marriage of Kelly*, 85 Wn. App. 785, 793, 934 P.2d 1218 (1997).

Our trial court properly considered the factors in RCW 26.19.090(2). Jordan is strong in math and earned a perfect Scholastic Assessment Test (SAT) score before he graduated. Jordan successfully completed his freshman year at a premier undergraduate school, Whitman College. Ms. Dickson had a high school education, and Mr. Dickson had a college degree. Mr. Dickson had paid Jordan's expenses in the past and had the ability to continue to pay his expenses. The only income Ms. Dickson received was spousal maintenance.

We do not second-guess the trial court's discretionary evaluation of these factors. The trial court does not abuse its discretion in determining postsecondary educational support if it considers all factors in RCW 26.19.090(2). *Goude*, 152 Wn. App. at 791. The trial court did not err in ordering Mr. Dickson to continue to provide postsecondary support for Jordan.

ISSUE V. Family Home

Mr. Dickson next contends the court erred in characterizing the proceeds from the sale of the family home as entirely community property and awarding the proceeds to Ms. Dickson. Property acquired prior to marriage or afterward by gift, bequest, devise, decent, or inheritance is presumed to be separate. RCW 26.16.010; *In re Estate of Borghi*, 167 Wn.2d 480, 483, 219 P.3d 932 (2009). The separate property presumption

17

can be rebutted by clear and convincing evidence of conversion to community property. *Borghi*, 167 Wn.2d at 490. When money in a joint account is hopelessly commingled and cannot be separated it is rendered entirely community property. *In re Marriage of Skarbek*, 100 Wn. App. 444, 448, 997 P.2d 447 (2000).

Mr. Dickson's inheritance was initially separate property. But, a party loses the benefit of any separate property presumption and assumes the burden of proving the separate character of property when he or she puts it "into an account where it [is] commingled with community funds." *Skarbek*, 100 Wn. App. at 449. The Dickson family home was purchased during the marriage in 2002, and was held in both parties' names. For nine years, the couple made mortgage payments with community funds. While part of the down payment was initially separate property, the funds were commingled thereby rendering the home community property. The trial court did not err in concluding likewise. The trial court also held discretion when awarding the proceeds from the sale of the family home to Ms. Dickson.

The trial court is in the best position to determine what is fair and equitable and has broad discretion in distributing the property and liabilities in dissolution proceedings. *In re Marriage of Brewer*, 137 Wn.2d 756, 769, 976 P.2d 102 (1999). We will not reverse a trial court's property distribution on appeal absent a showing of manifest abuse of discretion. *Id.*

18

ISSUE VI.  Retroactive Payments

Mr. Dickson made several payments to Ms. Dickson while the parties were separated, but before dissolution.  Mr. Dickson seeks a credit for the payments in the property distribution.  He objects to the characterization of the payments as spousal maintenance.

As addressed previously, the trial court has wide discretion in fashioning a fair property distribution.  *Brewer*, 137 Wn.2d at 769.  The trial court's denial of Mr. Dickson's request for a credit against the property distribution is reviewed for an abuse of discretion.

The trial court opted not to credit Mr. Dickson with the advances and to instead view the payments as maintenance or child support during separation.  The court also found, "It goes into the new determination that his upcoming [child] support amount is admittedly somewhat low given the bracket that he is in, but it is a recognition of what has been paid."  RP at 2103-04.  There was no abuse of discretion.

ISSUE VII.  Valuation Method of DI&M

The trial court valued DI&M at $2,500,000.  Mr. Dickson contends the trial court committed error in its valuation because it relied on the methods for calculating value set forth in *In re Marriage of Hall*, 103 Wn.2d 236, 692 P.2d 175 (1984).  Mr. Dickson contends the *Hall* methods should be employed only when valuing professional practices and not to a corporation engaged in selling commodities.

19

It is difficult to value the shares of a closely held corporation; the task calls for the careful weighing of relevant facts and the ultimate exercise of reasoned judgment. *In re Marriage of Gillespie*, 89 Wn. App. 390, 402, 948 P.2d 1338 (1997); *In re Marriage of Berg*, 47 Wn. App. 754, 756-57, 737 P.2d 680 (1987). The trial court must include in the record its method of valuation and the weight it gave to the factors it considered. *Berg*, 47 Wn. App. at 757. The valuation of a corporation is a factual issue that we review for an abuse of discretion. *Suther v. Suther*, 28 Wn. App. 838, 839-40, 627 P.2d 110 (1981); *Gillespie*, 89 Wn. App. at 403. The trial court has discretion to consider a variety of factors in assessing the value of a closely held business. *Gillespie*, 89 Wn. App. at 403 (citing *Suther*, 28 Wn. App. at 846-47). In determining whether substantial evidence exists to support a court's finding of fact, the record is reviewed in the light most favorable to the party in whose favor the findings were entered. *DeBenedictis v. Hagen*, 77 Wn. App. 284, 291, 890 P.2d 529 (1995).

Our trial court found that the capitalization of excess earning method was the most appropriate methodology to utilize in valuing DI&M. This method is known as method three in the seminal decision: *Hall*, 103 Wn.2d at 244. The *Hall* court, when reviewing the valuation of a physician's practice, listed five nonexclusive and not mutually exclusive methods in valuing businesses. 103 Wn.2d at 243-45. The Supreme Court described *Hall* method three as taking "the average net income of the business for the last five years[,] and subtract[ing] a reasonable rate of return based on the business'[s]

20

average net tangible assets. From this amount[,] a comparable net salary is subtracted.

Finally, this remaining amount is capitalized at a definite rate. The resulting amount is

goodwill." *Hall*, 103 Wn.2d at 244. This goodwill or intangible value is then added to

the value of the tangible assets to provide a total value of the business. *Id.*

Ms. Dickson's expert, Douglas Brajcich, employed *Hall* method three when

valuing DI&M. Mr. Dickson argues that the *Hall* method three should be limited to the

valuation of professional practices alone, contending that as a matter of law, this

methodology cannot be utilized to value DI&M. Mr. Dickson fails to cite legal authority

to support this proposition. Although the *Hall* decision involved the valuation of a

professional practice, the Supreme Court did not limit its holding to valuations of

practices. Our trial court set forth a lengthy analysis of its rationale, as well as underlying

evidence in support of adopting the methodology of Mr. Brajcich.

Mr. Brajcich valued the business enterprise at $3 million. Mr. Dickson's expert,

Mr. Harper, valued DI&M as ranging from $1,494,153 to $1,642,675. Both Brajcich and

Harper presented credible testimony and the trial court could have adopted either expert's

opinion. If either expert opinion could be accepted, the trial court should be free to

establish a value between the two amounts. The fact finder is given wide latitude in the

weight given expert opinion. In re *Marriage of Sedlock*, 69 Wn. App. 484, 491, 849 P.2d

1243 (1993). When the parties offer conflicting evidence in valuation, the court may

adopt the value asserted by either party, or any value in between the two. *In re Marriage of Rockwell*, 141 Wn. App. 235, 250, 170 P.3d 572 (2007); *Sedlock*, 69 Wn. App. at 491.

ISSUE VIII. $448,470 in Uncashed Checks

After the first two weeks of trial and while the trial court considered its ruling, Mr. Dickson carried $448,470 in checks in a duffel bag. The checks were signed in July and August 2010. The FBI seized the checks on August 31. Mr. Dickson had never accounted for the checks when he disclosed assets during discovery or when he testified at trial. In his favor, the checks were likely dated after the first session of trial. But one could conclude he still was hiding assets from his wife and the court. Strolling with $448,470 in checks, some more than one month old, is not an ordinary occurrence for someone engaged in legal activity.

During the reconvened trial, Mr. Dickson provided no explanation for carrying $448,470 in checks, other than the incredible explanation that he was too busy during the initial trial to deposit the money. Of course, he did not explain why he still carried the checks one month after completion of trial, or why a bookkeeper could not have deposited this huge amount. More importantly, the large amount of checks seized was consistent with the federal government's charges that Mr. Dickson committed the federal crime of structuring. Structuring is the act of parceling what would otherwise be a large financial transaction into a series of smaller transactions to avoid scrutiny by regulators or law enforcement. *See* 31 U.S.C. § 5324. Carrying large sums of money, rather than

22

depositing the money at one time to avoid reporting requirements, is the essence of structuring. *United States v. Gabel*, 85 F.3d 1217, 1223 (7th Cir. 1996). Structuring is sometimes performed to effectuate money laundering. *Id.*

Both valuation experts testified to a value of DI&M at a date at least one-year before trial. On appeal, Mr. Dickson argues that the $448,470 seized from him was similar in nature to cash balances reflected on balance sheets used by the experts to value the business on earlier dates. According to Mr. Dickson, the seized checks is a substitute for the cash balances on the balance sheets. Nevertheless, the trial court considered the checks to be an asset separate from the value of the business and charged the $448,470 to Mr. Dickson's side of the ledger when dividing the property's assets. Mr. Dickson complains about this allocation and argues that the $448,470 should be subsumed in the value of the business for purposes of dividing community assets. Stated differently, he grumbles that trial court engaged in double counting of the $448,470.

We reject Mr. Dickson's argument for various reasons. First, Mr. Dickson's own expert based his valuation of DI&M on a balance sheet listing a cash account of "$217,000." Ex. R-128.18. This account balance is more than $200,000 less than the checks carried by Dickson on August 31, 2010. The charges of structuring included activity starting on January 1, 2005, and continuing through the dates of the evaluations by the experts. Thus, Mr. Dickson likely carried large sums of money unaccounted for at the time of the preparation of company balance sheets used by the experts in evaluating

23

DI&M.

Mr. Dickson argues in general that none of the seized assets should be charged to him as assets in dividing the couple's property. Nevertheless, a trial court may consider the dissipation of assets and the failure to account for assets in the trial court's deliberations, relative to an equitable distribution. *In re Marriage of Clark*, 13 Wn. App. 805, 811, 538 P.2d 145 (1975). The trial court, in this instance, deemed that it was equitable to assign to Mr. Dickson the entire value of the forfeited community assets based on his criminal acts.

Mr. Dickson did not fully account for all of his assets during trial. He provided the court outdated tax returns. He engaged in criminal activity that harmed the marital community. If there is any confusion in the evidence as to double accounting, Mr. Dickson's unethical conduct caused the confusion. In short, Mr. Dickson came to court with unclean hands. Equity will not interfere on behalf of a party whose conduct in connection with the subject matter in litigation has been unconscientious, unjust, or marked by the want of good faith. *Income Investors v. Shelton*, 3 Wn.2d 599, 602, 101 P.2d 973 (1940); *Port of Walla Walla v. Sun-Glo Producers, Inc.*, 8 Wn. App. 51, 56, 504 P.2d 324 (1972).

Mr. Dickson's challenge concerns the distribution of property. A party challenging a property distribution must demonstrate that the trial court manifestly abused its discretion. *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152

24

(1984); *In re Marriage of Terry*, 79 Wn. App. 866, 869, 905 P.2d 935 (1995). We find a manifest abuse of discretion when the trial court exercises its discretion on untenable grounds. *In re Marriage of Olivares*, 69 Wn. App. 324, 328, 848 P.2d 1281 (1993).

In a dissolution action, the trial court must make a "just and equitable" distribution of the property and liabilities of the parties after considering all relevant factors, including the nature and extent of the separate and community properties and the duration of the marriage. RCW 26.09.080. The trial court's paramount concern when distributing property in a dissolution action is the economic condition in which the decree leaves the parties. *Williams*, 84 Wn. App. at 270; RCW 26.09.080. We find no abuse of discretion in the trial court's property division.

ISSUE IX. Attorney Fees Below

Mr. Dickson challenges the trial court's award of attorney fees to Ms. Dickson. Like his argument regarding the characterization of the family home, he fails to provide any citation to legal authority to support his terse argument. He challenges both a 2009 order to pay fees for $25,000 and a 2011 attorney fee award in the decree of dissolution for $59,047. The 2009 fees were awarded by a superior court commissioner, who was frustrated at Mr. Dickson's failure to provide credible information about his finances. Both awards were based on need and ability to pay.

Case law is well established that "[a]n award of attorney fees rests within the sound discretion of the trial court, which must balance the needs of the spouse requesting

25

the fees with the ability of the other spouse to pay." *In re Marriage of Mathews*, 70 Wn. App. 116, 125, 853 P.2d 462 (1993). A party challenging the trial court's decision to award attorney fees "bears the burden of proving the trial court exercised its discretion in a way that was 'clearly untenable or manifestly unreasonable.'" *Crosetto*, 82 Wn. App. at 563 (quoting *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994)).

Mr. Dickson is a successful business man with a gross monthly income of $23,714. Ms. Dickson only has a high school education, few marketable skills, and a gross monthly income of $6,500, which consists solely of her maintenance award. Based on these facts, the court had tenable grounds to award attorney fees to Ms. Dickson.

ISSUE X.   Attorney Fees on Appeal

Both parties request attorney fees on appeal under RAP 18.1. In general, RAP 18.1 sets forth the procedure for requesting fees on appeal; it is not the applicable law that grants fees. Nevertheless, under RCW 26.09.140, this court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal, including attorney fees, in addition to statutory costs. This provision gives the court discretion to award attorney fees to either party based on the parties' financial resources, balancing the financial need of the requesting party against the other party's ability to pay. *In re Marriage of Pennamen*, 135 Wn. App. 790, 807-08, 146 P.3d 466 (2006).

26

No. 30459-1-III
*In re Marriage of Dickson*

Under RAP 18.1(c), the parties have until 10 days prior to the date of appellate oral argument to file their declarations of financial need. Neither party complied with this rule. Therefore, we deny both parties an award of reasonable attorney fees and costs.

CONCLUSION

We remand the case to the trial court to recalculate child support based upon a two-child family. Otherwise, we affirm the rulings of the trial court and applaud the trial court for its handling of a difficult dissolution.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

Fearing, J.

I CONCUR:

Korsmo, J.

27

No. 30459-1-III

SIDDOWAY, C.J. (dissenting) — It is hard to dispute Craig Dickson's contention that the trial court exercised its discretion in favor of his former wife at virtually every turn in resolving the property distribution, spousal maintenance, and child support issues in this divorce. In the case of all but one of the rulings he challenges on appeal, however, I agree with the majority that we have no basis for reversing the trial court. Trial court decisions in a dissolution action will seldom be changed upon appeal; we will affirm unless no reasonable judge would have reached the same conclusion. *Tatham v. Rogers*, 170 Wn. App. 76, 106, 283 P.3d 583 (2012) (citing *In re Marriage of Landry*, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985)). The trial court's rulings generally have a basis in the evidence and fall within the broad scope of its discretion.

Where I part ways with my colleagues is in connection with the trial court's decision to treat the $448,470 in checks payable to Dickson Iron & Metals, Inc. (DI&M) that were seized from a duffel bag in Mr. Dickson's possession at the end of August 2010 as a noncorporate asset, which the court then allocated to him along with 100 percent of the stock in DI&M valued as of year-end 2008. This is double-counting, pure and simple.

Daneille Dickson was initially referred to her valuation expert, Douglas Brajcich, in the latter part of 2009 for legal advice, not valuation work. She was referred to Mr. Brajcich by her divorce lawyer, Martin Salina, after he learned she had discovered $462,000 in cash in a duffel bag in her husband's truck. Mr. Brajcich discussed the cash with Mr. Dickson's lawyer and by agreement of the parties, the cash (or almost all of it) was placed in a safety deposit box. Concerned about the source of the funds and whether taxes had been paid on them, Mr. Brajcich advised Ms. Dickson to file her tax returns separately from that point forward. In a later deposition and at trial, Mr. Dickson claimed that he had been setting cash aside over a period of time because of a concern over potential environmental liabilities of his business and a desire to safeguard money for his children's future college education.

When Mr. Brajcich was retained to serve as Ms. Dickson's valuation expert, then, he had concerns about the large amount of cash and the reliability of DI&M's internal income statements. He approached the valuation assignment with those concerns in mind. In preparing his valuation, he had access to DI&M's income tax returns from 2001 through 2008, internal income statements for later periods, and the couple's individual income tax returns going back to the 1990s. He chose to value the corporation as of December 31, 2008, based on its income tax reporting for the three years prior, explaining that he considered that financial information to be the most reliable. In

2

support of the validity of his valuation, he testified at trial that based on his interviews and review of records, Mr. Dickson's business model had never changed.

Based on his concern that the cash Ms. Dickson discovered might not have been fully reflected in the company's operating results, Mr. Brajcich adjusted the income of the corporation in his excess earnings analysis upward by $40,000. When asked at trial why he had not increased the income by $150,000 ($450,000 divided by three years), he explained that he was not sure if tax had been paid on the income represented by the cash and also recognized that Mr. Dickson had taken draws totaling $510,000 in 2007 and 2008, which might account for some of the cash. The $40,000 increase in excess earnings was multiplied by four by Mr. Brajcich in determining goodwill, for a $160,000 increase in the value of the company.

The trial court largely relied upon Mr. Brajcich's valuation in making its property distribution, finding that Mr. Brajcich had "placed the appropriate emphasis on those tax years for which the income reporting was most probably accurate." Clerk's Papers (CP) at 818. It rejected only Mr. Brajcich's approach to arriving at a reasonable salary for Mr. Dickson. Given Mr. Brajcich's valuation approach, that meant that the court largely accepted his excess earnings analysis. Among assets as of year-end 2008 that were included by Mr. Brajcich in calculating the return on investment component of his excess earnings analysis was the $574,000 cash on hand at that time.

3

It is undisputed that the $448,470 in checks later seized by federal agents belonged to DI&M. The checks were all made payable to DI&M. It is undisputed that they were for recent periods of operations; all were dated between mid-July and late August 2010. Yet, having separately allocated to Mr. Dickson 100 percent of the value of the DI&M stock as of December 31, 2008—the valuation date Ms. Dickson's expert chose to use for a valuation that took into consideration $574,000 in cash on hand—the court treated these later checks, reflecting later accounts receivable, as an additional asset.

The majority affirms the trial court's allocation of this supposedly separate asset to Mr. Dickson on the basis that the existence of the checks in his duffel bag tends to confirm the fact that he was engaged in criminal structuring and that carrying six weeks' worth of checks around in a duffel bag casts continuing doubt on the reliability of the financial information available to Mr. Brajcich in performing his work.

As to the rationale that the checks tend to support Mr. Dickson's involvement in criminal structuring, it is hard to see why more evidence on that score is needed or relevant. Mr. Dickson pleaded guilty. Because he did, the trial court charged him with full financial responsibility for the $1.36 million in forfeitures to which he and Ms. Dickson had agreed. It did so on the basis of disputed evidence that Mr. Dickson acted without his wife's knowledge and that his activities diminished rather than increased the size of the marital estate. Those factual disputes were for the court to resolve, and I agree with the majority that the court's findings support its allocation of the substantial

4

forfeited assets. There are no facts supporting a new and additional $448,470 asset, though, even if the checks in the duffel bag are further evidence of suspicious money handling.

As to the possible unreliability of the financial records, that possibility was known to Ms. Dickson and her expert even before the federal seizure of assets. Mr. Brajcich took it into consideration in the timing of his valuation and made adjustment for it. He explained his reasoning and was subject to cross-examination. If the possible unreliability of DI&M's financial records warranted some adjustment, then the trial court should have based the adjustment on the parties' evidence—not by double counting DI&M's cash on hand.

Notably, it was not Ms. Dickson who asked to reopen the trial after federal agents seized the $448,470 in checks. She never contended that the seizure undermined Mr. Brajcich's year-end 2008 valuation or would cause him to choose a different valuation date. It was Mr. Dickson who asked the court to reopen evidence. Ms. Dickson opposed the request, testifying by a declaration signed several weeks after the duffel bag of checks was seized that "[t]he mere fact that search warrants have been issued and that there has been some notoriety in the marketplace, does not in and of itself warrant a re-trial of the issues in this case, particularly the business valuation issue." CP at 351-52.

None of us condones Mr. Dickson's activities but it was the federal court's role, not the trial court's or ours, to sentence him for his criminal wrongdoing. The role of the

5

No. 30459-1-III – dissent
*In re Marriage of Dickson*

trial court and this court is to see that the couple's property is distributed in accordance with Washington law. There was no factual basis for the trial court to include the $448,470 as a new, noncorporate asset. I therefore respectfully dissent.

_____
Siddoway, C.J.

6