IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| PATRICIA A. BELL, | ) | |
| | ) | No. 37359-2-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CARLO A. DILORENZO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Patricia Bell appeals final orders entered in a proceeding for

dissolution of her marriage from Carlo DiLorenzo in which the superior court exercised

jurisdiction over only parenting issues. She challenges the trial court's refusal to order a

change of venue, contends that insufficient evidence supports its refusal to deviate

upward in ordering child support from Mr. DiLorenzo, and challenges the court's denial

of her request for attorney fees and its order finding her in contempt. We find no error,

affirm, and deny Mr. DiLorenzo's request for an award of fees and costs on appeal.

FACTS AND PROCEDURAL BACKGROUND

Patricia Bell and Carlo DiLorenzo were married in December 2014 in upstate New

York. At the time, Mr. DiLorenzo was operating a restaurant, the franchise for which he

had purchased with his mother, Bernadette Gaerlan. Ms. Gaerlan was a 51 percent owner

of the franchise. The restaurant consistently lost money, so Ms. Bell and Mr. DiLorenzo were required to rely on family members for financial support during their short marriage. Before and during the marriage, Ms. Gaerlan paid Ms. Bell's and Mr. DiLorenzo's rent and provided them with a monthly allowance for living expenses.

In November 2015, a meeting was held between Mr. DiLorenzo, Ms. Bell and Ms. Gaerlan in which Ms. Gaerlan said she would provide them with another $50,000 a year for expenses, but her annual support would end around October 2016.

In January 2016, Mr. DiLorenzo's father died intestate. Mr. DiLorenzo learned that he could expect to inherit about $3.9 million from his father's estate. Ms. Gaerlan, who had never married Mr. DiLorenzo's father, had no entitlement to the estate. At the Pierce County dissolution trial, Mr. DiLorenzo testified that he agreed with Ms. Gaerlan that as he received the inheritance, he would apply it to repay her for financial assistance she had provided in the past.

In March 2016, the New York restaurant franchise was sold for $106,000. The entire $106,000 went to Ms. Gaerlan to repay her for her cash contributions to the business, which had totaled $571,000. In connection with the closing of the franchise sale, Mr. DiLorenzo signed a promissory note for the remaining $458,604 he conceded owing to Ms. Gaerlan for financing of the franchise operation.

After the franchise sold, Ms. Bell and Mr. DiLorenzo decided to move to the greater Seattle area. Ms. Bell's parents lived there, and Mr. DiLorenzo was interested in

2

working in the tech industry. To prepare himself for tech employment, Mr. DiLorenzo attended a three-month coding emersion program in Texas. While he attended the program, Ms. Bell and the parties' two young sons moved to Washington and lived with her parents.

After completing the program, Mr. DiLorenzo applied for jobs in Seattle and he and Ms. Bell started looking for housing. Their marriage had evidently soured, however, because Mr. DiLorenzo turned down a job offer and returned to New York, where he filed for divorce in early November 2016. A few weeks after being served with Mr. DiLorenzo's divorce papers, Ms. Bell petitioned for divorce in Washington.

Washington and New York trial judges assigned to the competing proceedings consulted and agreed that the children did not have a "home state" under the Uniform Child Custody Jurisdiction and Enforcement Act[1] at the time Mr. DiLorenzo filed the first petition. It was resolved that New York would continue to exercise jurisdiction over the parties' dissolution except with respect to matters involving the children, which could be more conveniently addressed in Washington.

A temporary parenting plan was entered in Pierce County that placed the children with Ms. Bell and gave Mr. DiLorenzo liberal supervised visitation. Although the temporary child support order recognized that neither Mr. DiLorenzo nor Ms. Bell was

---

[1] In Washington, chapter 26.27 RCW.

3

employed and under a standard computation Mr. DiLorenzo would owe child support of only $642.94 per month, he was ordered to pay $5,000.00 per month based on Ms. Bell's evidence of his assets and "access to wealth." Clerk's Papers (CP) at 26. Mr. DiLorenzo moved for revision. The superior court reduced the monthly obligation but only slightly, to $4,600.00, imputing income of $50,000.00 per month to Mr. DiLorenzo.

Until Mr. DiLorenzo became employed in March 2017, the evidence at the dissolution trial was that Ms. Gaerlan paid his child support obligation. Once he became employed, at a salary of $80,000 per year, Mr. DiLorenzo paid $1,600 per month toward the child support obligation and Ms. Gaerlan paid the remaining $3,000 per month.

Many motions were filed and orders were entered during the dissolution action that addressed child support, restraining provisions, and visitation, but few of the details are relevant to issues on appeal. The first relevant development was Ms. Bell's decision in or before October 2017 to have a private investigator do a background check on Kate Lee, a professional visitation supervisor appointed by the court to supervise Mr. DiLorenzo's visitation. Ms. Lee was upset on learning that Ms. Bell was having her investigated and she withdrew as visitation supervisor, stating she could "no longer be objective." CP at 65. Mr. DiLorenzo brought Ms. Lee's withdrawal to the attention of the court in connection with a motion to give him unsupervised visitation and to restrain Ms. Bell from surveilling him.

Dissatisfied with the outcome of that motion before a court commissioner, Mr. DiLorenzo filed a motion for revision that was heard by Judge Kitty van Doorninck. In ruling on the motion, the judge commented on "bad behavior on both sides" and said she wanted the negative aspersions between the parties to stop. CP at 239. After granting some of the relief requested by Mr. DiLorenzo, the judge also stated,

> The behavior with Ms. Lee is appalling to me. Ms. Lee has been a respected professional person in the community for a long time. For her to feel forced that she needs to respond to the allegations, without the professional courtesy of talking to her.

CP at 242. Addressing Ms. Bell's counsel, the judge continued,

> [Y]ou have requested, and I have put in orders multiple times, that Ms. Lee be the supervisor. And to have this kind of declaration in this court file is, frankly, appalling to me, without the courtesy of talking to her about whatever the issue was. And just putting it all in for the public. So I'll just say that for the record.

*Id.*

Through counsel, Ms. Bell made a timely motion for reconsideration of Judge van Doorninck's order. Ms. Bell also filed her own pro se "affidavit . . . in support for a motion to reconsider recent court rulings." CP at 166. Her affidavit asked that Judge van Doorninck recuse herself if she had "a personal bias or prejudice concerning [Ms. Bell] and [her] allegations about a court-appointed felon within her ranks." CP at 171. Judge Van Doorninck denied the reconsideration motion filed by counsel and took no action on Ms. Bell's pro se affidavit.

5

Several weeks later, Ms. Bell filed another pro se submission titled "New Evidence that G.A.L. Kate Lee is an Unqualified Felon[;] Motion for Judge van Doorninck to Recuse Self for Retaliation Against Party Raising this Actual Fact." CP at 209. Ms. Bell again asked Judge van Doorninck to recuse herself. Shortly after this second pro se submission, Ms. Bell's lawyer withdrew. During this same time frame, the superior court issued a routine reassignment letter informing parties assigned to Family Court 2 (as Ms. Bell and Mr. DiLorenzo were) that as of January 1, 2018, their judge would be Karena Kirkendoll.

It turned out that Ms. Lee did have a criminal history. On January 20, evidently acting on a tip provided by Ms. Bell's new lawyer,[2] the Tacoma *News Tribune* ran an article discussing how the Bell/DiLorenzo divorce had uncovered Ms. Lee's criminal record. The story stated that Ms. Bell's charge, "dismissed at first as a false allegation from an angry spouse, rocked the tiny world of the courthouse." CP at 421. According to the story, the superior court's presiding judge had "sent a directive to judges and court commissioners, telling them that Lee shouldn't be approved as a visitation supervisor in future family-court cases." *Id*. The presiding judge was quoted as telling the paper, "'My concern is that she's impeachable as a witness.'" CP at 422. The presiding judge

---

[2] Ms. Bell claimed that her lawyer was the origin of the story in an affidavit later filed with the court.

6

was also quoted as saying, "'No one's ever had any basis to question the quality of [Ms. Lee's] work. We're all just trying the best we can for children. I have no reason to think Ms. Lee was doing anything other than that. It's a really sad situation.'" CP at 424. Judge van Doorninck was quoted as telling a reporter she had mistakenly "assumed the allegations about Lee weren't true" based on a declaration filed in the case. CP at 423.

Three days after the story ran, Ms. Bell filed another pro se pleading asking for a change of venue to King County. She asked that "the entire court and every Pierce County judge or commissioner to please recognize the forum for this divorce is better moved elsewhere." CP at 247. She noted her motion for a hearing. Mr. DiLorenzo filed opposition materials and requested CR 11 sanctions.

On the day the venue motion was heard, Ms. Bell's new lawyer entered a limited appearance.[3] The trial court refused to consider late-filed materials that were not served on opposing counsel. It nonetheless entertained Ms. Bell's lawyer's argument that the news article and public comments by two judicial officers created a "conflict of interest that blankets the entire court" because the "top judge . . . has informed everyone . . . that this is a really sad situation, what Ms. Bell did." Report of Proceedings (RP) (Feb. 2, 2018) at 5.

---

[3] His "Limited Notice of Appearance" stated, "My appearance is limited to this one day." CP at 1051.

Mr. DiLorenzo pointed out that the only two judges quoted in the news article were the presiding judge, who never made a ruling in the dissolution case, and Judge van Doorninck, who had been rotated out. He argued that for the court to decline to hear the case on the basis of judicial partiality, Ms. Bell had to "provide proof of actual bias by the judicial officer hearing the case," which Ms. Bell had not shown as to Judge Kirkendoll, and that judicial remarks and unfavorable rulings were not enough. RP at 22-24. He noted that the issue of pretrial publicity was a nonissue because the matters would not be decided by a jury.

Judge Kirkendoll denied the change of venue motion, stating in her oral ruling, "[I]n this situation, I cannot find bias. I cannot in any way find bias of 22 judges against this case." RP at 38. She continued,

> I have just entered into this rotation from a criminal rotation. I have no background in this case. I have no understanding of what's going on in this case. I have no knowledge of either party or any relationship with anyone in this case.

*Id*. Ms. Bell moved for reconsideration, which was denied.[4]

---

[4] Ms. Bell's reconsideration motion requested a copy of "the letter [presiding] Judge Martin sent to all other judges." CP at 411. A contemporaneous "Request for Court's Discovery of Chief Martin Letter to Pierce County Judges Re Appearance of Impropriety," CP at 425, also asked for a copy of such a letter, without identifying any rule or statute as authority for the request. The fact that the court did not file a copy of the letter, assuming one existed, is a nonissue. If Ms. Bell deemed any letter to be critical to her motion there were methods by which she could have obtained it. She did not.

8

At or about the same time as recusal and venue were becoming issues in Washington, Ms. Bell and Mr. DiLorenzo entered a settlement agreement resolving the property and divorce issues pending in New York. As part of the New York settlement agreement Ms. Bell received a $90,000 distribution that she applied to legal bills and to monies her father had advanced on her behalf.

In May 2018, Ms. Bell and Mr. DiLorenzo reached a final parenting plan by entering into a CR 2A agreement. They did not agree on a child support order and the issue of attorney fees was reserved.

On May 30, the parties proceeded to a six-day trial to resolve issues relating to child support, attorney fees, intransigence, and restraining orders. The trial court heard testimony from Ms. Bell, her father, Mr. DiLorenzo, his mother, and Ms. Bell's private investigator.

It was undisputed at trial that Mr. DiLorenzo received an interim distribution from his father's estate of $200,000.00 in February 2017, all of which he paid toward his March 2016 promissory note to Ms. Gaerlan. In May 2017, Mr. DiLorenzo executed a second promissory note to Ms. Gaerlan in the amount of $393,643.00 to repay her for additional amounts she had advanced him during and prior to the parties' divorce.[5] When

---

[5] Included were the child support and attorney fees she had advanced, his rent incurred during the time he was living in New York, the living allowance she had provided to Mr. DiLorenzo and Ms. Bell from November 2015 to October 2016, Mr. DiLorenzo's coding program, Mr. DiLorenzo's preparation course for the coding

he received a second interim distribution of $500,000.00 from his father's estate in September 2017, Mr. DiLorenzo used it to pay Ms. Gaerlan the $279,769.41 remaining balance on his March 2016 promissory note and to make a partial payment on the May 2017 promissory note. On September 29, Mr. DiLorenzo and Ms. Gaerlan canceled the May 2017 promissory note and replaced it with a new promissory note for the $174,780.23 he continued to owe.

Ms. Bell's father testified at trial that he had subsidized her litigation and living expenses in an amount exceeding $300,000, and while no promissory notes had been prepared, he and Ms. Bell had an understanding from the outset that the monies he was advancing needed to be repaid.

On June 14, the trial court issued an oral ruling. It entered a final order and findings in August 2018. Relying on imputed income for Ms. Bell of $2,446.00 per month and actual income for Mr. DiLorenzo of $4,729.96 per month, it arrived at a child support transfer payment liability for Mr. DiLorenzo of $980.95 per month. On the issue of whether the monthly child support amount should deviate from the standard calculation, it determined that it should not, finding:

> Mr. DiLorenzo has no possession of wealth at this time. Furthermore, the evidence shows it could take years for Mr. DiLorenzo to realize his

---

program, Ms. Bell's engagement ring, Mr. DiLorenzo's 2009 BMW, and Mr. DiLorenzo's college tuition.

10

inheritance. Until such time, Mr. DiLorenzo has no wealth that would form the basis for an upward deviation in child support.

Ordering a transfer payment via an imputation of future income or granting a deviation without specific written findings regarding the identifiable assets owned and the values thereof, in addition to written findings documenting the children's need for additional support, is inappropriate.

CP at 473.

As for attorney fees, the trial court observed in its oral ruling that despite the parties' having been in what was only a 22-month marriage during which there were no community earnings or assets, Ms. Bell and Mr. DiLorenzo had both incurred fees "well into the six-figure range . . . largely attributable to the aggressive litigation stance taken by Ms. Bell, which Mr. DiLorenzo asserts was solely due to his anticipated inheritance." RP (June 14, 2018) at 990. It provided a number of examples. It awarded Mr. DiLorenzo $10,000 in attorney fees based on Ms. Bell's intransigence.

The parenting plan entered by the court was based on the CR 2A agreement but was modified by the court to include an abusive use of conflict finding under RCW 26.09.191 against Ms. Bell. It granted Mr. DiLorenzo's request for a continuing restraining order.

Ms. Bell moved for reconsideration, which was denied.

In November 2018, Mr. DiLorenzo filed a motion asking the superior court to find Ms. Bell in contempt for failures to follow the final parenting plan. A commissioner

11

found Ms. Bell failed to obey a number of the parenting plan provisions, and did so in bad faith. Ms. Bell moved for revision.

Her revision motion was granted in part. But the trial court affirmed the commissioner's findings that Ms. Bell, acting in bad faith, failed to comply with three parenting provisions: the provisions requiring her to pay her portion of mediation fees, load the children's appointments onto Our Family Wizard,[6] and assist the children with Skype calls with Mr. DiLorenzo. Ms. Bell's motion for reconsideration of these contempt findings was denied. She appeals.

## ANALYSIS

Ms. Bell makes nine assignments of error that we reorganize as raising four issues: (1) did the trial court err in denying her motion for change of venue, (2) does insufficient evidence support the trial court's findings in refusing to deviate from the standard child support calculation, (3) did the trial court abuse its discretion in refusing to award Ms. Bell attorney fees, and (4) did the trial court err or abuse its discretion in finding her in contempt. We address the issues in the order stated.

---

[6] Our Family Wizard is an online platform that, among other features, allows parents to communicate through a message board and use the calendar feature to share appointments and schedules. *See Product Features*, OUR FAMILY WIZARD, https://www.ourfamilywizard.com/product-features [https://perma.cc/V4YM-3Z78].

I. CHANGE OF VENUE

RCW 4.12.030 identifies the grounds under which a court may change the place of trial. The ground relied on here is "[t]hat there is reason to believe that an impartial trial cannot be had [in the county designated by the complaint]." RCW 4.12.030(2). In Ms. Bell's motion for a change of venue, she appeared to rely on pretrial publicity created by the Tacoma *News Tribune* article. Nonetheless, because her submissions and argument included a number of allusions to all 22 Pierce County Superior Court judges being disqualified, we will review her contention on appeal that she was complaining of an appearance of bias.

Beginning with *State v. Post*, 118 Wn.2d 596, 826 P.2d 172, 837 P.2d 599 (1992), the Washington Supreme Court has characterized a judge's failure to recuse himself or herself when required to do so by the judicial canons as a violation of the appearance of fairness doctrine. *Tatham v. Rogers*, 170 Wn. App. 76, 94, 283 P.3d 583 (2012). Rule 2.11(A) of the Code of Judicial Conduct (CJC) provides that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." (Asterisk omitted.)

In deciding whether recusal is warranted "actual prejudice is not the standard. The CJC recognizes that where a trial judge's decisions are tainted by even a mere suspicion of partiality, the effect on the public confidence in our judicial system can be debilitating." *Sherman v. State*, 128 Wn.2d 164, 205, 905 P.2d 355 (1995). Because the

13

trial court is presumed to perform its functions regularly and properly without bias or prejudice, *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 841, 14 P.3d 877 (2000), "[a] party asserting a violation of the [appearance of fairness] doctrine must produce sufficient evidence demonstrating bias, such as personal or pecuniary interest on the part of the decision maker; mere speculation is not enough." *In re Pers. Restraint of Haynes*, 100 Wn. App. 366, 377 n.23, 996 P.2d 637 (2000).

Similar to another Pierce County case, *West v. Osborne*, 108 Wn. App. 764, 770, 34 P.3d 816 (2001), Ms. Bell presented no evidence that showed, or even suggested, that Judge Kirkendoll (or for that matter, other Pierce County judges) would not be impartial. Ms. Bell's argument in the trial court was that because the uncovering of Ms. Lee's criminal background resulted in a directive that judges no longer appoint Ms. Lee to supervise visitation, a situation the presiding judge characterized as "sad," then every Pierce County judge would hold this "sad situation" against Ms. Bell. This makes no sense. Ms. Bell turned out to be right about Ms. Lee's background. Bringing the matter to light enabled the superior court to take action to ensure that future cases would not be compromised by Ms. Lee's vulnerability to impeachment. A reasonable observer knowing all the facts, including that the presiding judge viewed it as a sad situation, would not infer that the presiding judge or any of the other 21 superior court judges would be biased against Ms. Bell.

Because Ms. Bell presented no evidence from which bias could reasonably be inferred, there was no reason for Judge Kirkendoll to recuse herself and no reason to grant a change of venue.

II.     THE TRIAL COURT'S FINDINGS IN DENYING A DEVIATION FROM STANDARD CHILD SUPPORT ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

Turning to the issue of Mr. DiLorenzo's wealth, it is important to be clear about what is <u>not</u> at issue in this case.  We are occasionally presented with cases in which one spouse contends that *community property* should be applied to repay a parent for prior financial support.  In those cases, the spouse disputing the obligation to repay must be heard out on whether there was an agreement to repay, and, if there was, whether the agreement was valid and enforceable.  Where, as here, the monies paid to Ms. Gaerlan were from Mr. DiLorenzo's *separate property*, Ms. Bell can try to prove that he never really dispossessed himself of the distributions.  But if Mr. DiLorenzo believed he owed the amounts to Ms. Gaerlan and paid her in good faith, Ms. Bell's ideas about how he could have disputed the obligation are irrelevant.  The money was his, not hers.

By statute, "The basic child support obligation derived from the economic table shall be allocated between the parents based on each parent's share of the combined monthly net income."  RCW 26.19.080(1).  "This standard calculation is the presumptive amount of child support owed as determined by the child support schedule before the

15

court considers any deviation." *In re Marriage of Selley*, 189 Wn. App. 957, 960, 359 P.3d 891 (2015).

Once the standard calculation is determined, the trial court then considers, if requested, "whether a deviation from the standard calculation is appropriate." *Id.* RCW 26.19.075 provides a nonexclusive list of reasons for the trial court to deviate. RCW 26.19.075(1). One reason to deviate is a party's "[p]ossession of wealth." RCW 26.19.075(1)(a)(vi).

When granting or denying a request to deviate from the standard calculation, the trial court must enter written findings. RCW 26.19.075(3). The findings "must provide 'specific reasons' for its decision . . . and those findings must be supported by substantial evidence." *State ex rel. J.V.G. v. Van Guilder*, 137 Wn. App. 417, 424, 154 P.3d 243 (2007). Here, the relevant findings in the court's final order were

> 7.  Respondent's Father, Alexander Dilorenzo, died in January 2016. Respondent has a substantial anticipated inheritance.
>
> 8.  Uncontroverted evidence in the form of bank records, financial institution records, tax records, correspondence from the probate attorney handling Alexander Dilorenzo's estate, and credible testimony from Carlo Dilorenzo, his mother, Ms. Bernadette Gaerlan, and even Petitioner's private investigator, Ron Bone, proved Mr. Dilorenzo has no possession of wealth at this time. Evidence shows it could take years for Respondent to realize his inheritance.
>
> 9.  Until such time, Mr. Dilorenzo has no wealth that would form the basis for an upward deviation in child support.

CP at 462.  The trial court left open the possibility that Ms. Bell could seek a modification of the child support order if and when Mr. DiLorenzo received his remaining inheritance.

Ms. Bell's argument that the trial court's findings are not supported by substantial evidence is that Mr. DiLorenzo "had $700,000 of wealth, which he gratuitously gave to his mother."  Br. of Appellant at 26.  She ignores the standard of review.  In determining whether substantial evidence exists to support a superior court's finding of fact, we review the record in the light most favorable to the party in whose favor the findings were entered—here Mr. DiLorenzo.  *In re Marriage of Gillespie*, 89 Wn. App. 390, 404, 948 P.2d 1338 (1997).  We do not substitute our judgment for the superior court's judgment, weigh the evidence, or evaluate witness credibility.  *In re Marriage of Wilson*, 165 Wn. App. 333, 340, 267 P.3d 485 (2011).  Mr. DiLorenzo and Ms. Gaerlan testified that he used the $700,000 to repay amounts owed her for monies advanced over the years.  The trial court found their testimony credible.  Substantial evidence supports the court's findings.

III.    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING MS. BELL'S REQUEST FOR ATTORNEY FEES

The trial court did not award either party attorney fees based on need and ability to pay.  Ms. Bell argues it abused its discretion in denying her request, because it failed to consider the $700,000 in distributions Mr. DiLorenzo received from his father's estate.

The trial court's decision whether to grant attorney fees under RCW 26.09.140 is reviewed for an abuse of discretion. *In re Marriage of Spreen*, 107 Wn. App. 341, 351, 28 P.3d 769 (2001). "The party challenging the award bears the burden of proving that the trial court exercised this discretion in a way that was clearly untenable or manifestly unreasonable." *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994). For reasons already explained, substantial evidence supported the trial court's findings that the distributions to Mr. DiLorenzo were promptly applied to amounts owed his mother. The court's discretion was not abused.

IV. CONTEMPT

Finally, Ms. Bell challenges the court order finding her in contempt.

In November 2018, Mr. DiLorenzo moved for an order finding Ms. Bell in contempt for alleged violations of the final parenting plan. The motion was heard by a court commissioner, who found, following a hearing, that Ms. Bell failed to follow the parenting plan in seven respects. It found that in failing to follow the plan, she acted in bad faith. Its order indicated that Ms. Bell could purge the contempt by obeying the parenting plan. It imposed a civil penalty of $100 and awarded Mr. DiLorenzo $2,500 in attorney fees.

Ms. Bell moved for revision. The trial court reversed some of the commissioner's findings of willful disobedience but affirmed its findings that Ms. Bell acted in bad faith in disobeying subsections 6b, 14b, and 14a of the parenting plan. Ms. Bell contends the

18

trial court erred because the parenting plan provisions were vague and it failed to consider whether she acted in bad faith.

In the context of dissolution and parenting orders, contempt is governed by RCW 26.09.160, which provides, "a court shall find a party in contempt when 'the court finds after hearing that the parent, in bad faith, has not complied with the order establishing residential provisions for the child.'" *In re Marriage of James*, 79 Wn. App. 436, 440, 903 P.2d 470 (1995) (quoting RCW 26.09.160(2)(b)). "In determining whether the facts support a finding of contempt, the court must strictly construe the order alleged to have been violated, and the facts must constitute a plain violation of the order." *In re Marriage of Humphreys*, 79 Wn. App. 596, 599, 903 P.2d 1012 (1995). "Punishment for contempt of court is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." *In re Marriage of Mathews*, 70 Wn. App. 116, 126, 853 P.2d 462 (1993). "A trial court abuses its discretion by exercising it on untenable grounds or for untenable reasons." *James*, 79 Wn. App. at 440.

*Subsection 6b: Payment of Ms. Bell's share of mediation costs*

The parenting plan provides that to resolve disagreements about the plan, the parents will engage in mediation with Norm Margullis. *See* CP at 488 (Subsection 6a). Subsection 6b provides in relevant part:

> 6. Dispute Resolution - If you and the other parent disagree:
> . . . .
> b. . . . .

> The parents will pay for the mediation, arbitration, or counseling services as follows *(check one):*
>
> ☒ Each parent shall pay-50% ~~of the cost~~ per the child support worksheet.

CP at 489 (boldface omitted).

On November 19, 2018, Mr. DiLorenzo's lawyer notified Ms. Bell's lawyer by electronic mail that Mr. DiLorenzo "incurred $2,450 in mediation fees on Friday, $833 of which is your client's 34% share. Ms. Bell may send payment to my office." CP at 605. In moving for contempt, Mr. DiLorenzo represented that Ms. Bell's share of the expense had not been paid.

In her declaration in opposition to the contempt motion, Ms. Bell did not dispute the meaning of subsection 6b or claim to have paid her share; instead, she complained that in 8 hours of mediation with Mr. Margullis on a range of topics, "Carlo agreed to exactly zero. The mediation was a waste of everyone's time, its only purpose was to further impoverish me . . . . I should not be ordered to pay for a worthless mediation." CP at 678-79.

At the revision hearing taking place on January 11, 2019, the trial court asked if Ms. Bell had paid the mediator's fees and Ms. Bell's lawyer admitted she had not.

For the first time on appeal, Ms. Bell contends that the mediation payment provision is vague because it might have been "intended to require each party to pay a percentage of mediation fees according to their proportional share of income, *but it*

20

*cannot be said that this is clear*." Br. of Appellant at 36 (emphasis added). She suggests

for the first time on appeal that the provision was ambiguous in failing to address *when*

she should pay. She argues that because the mediation fee is not child support, contempt

for nonpayment is improper. *But see* RCW 26.09.160(1) (providing that punishment

extends it to any "refus[al] to perform the duties provided in the parenting plan").

Our rules provide that an appellant is not entitled to review of an issue raised for

the first time on appeal. RAP 2.5(a). And the fact that none of these arguments was

made in Ms. Bell's 27-page opposition declaration or in oral argument underscores their

disingenuous character. We refuse to consider these unpreserved issues.

Ms. Bell also complains that the trial court did not make its own explicit finding of

bad faith. When "the superior court makes independent findings and conclusions, the

order on revision supersedes the commissioner's ruling." *In re Guardianship of Knutson*,

160 Wn. App. 854, 863, 250 P.3d 1072 (2011). When it denies revision, however, the

trial court is deemed to adopt the commissioner's decision, and is not required to enter

separate findings and conclusions. *In re Marriage of Williams*, 156 Wn. App. 22, 27-28,

232 P.3d 573 (2010). Here, the trial court stated it was affirming the commissioner's

contempt decision as it related to subsections 6a, 14a, and 14b.

The commissioner had orally announced, "I find that under the totality of those

matters that affect the children, not including restraining order violations and the like,

that there is a willful and intentional violation of the court order and I do believe it is in

bad faith." CP at 780-81. The commissioner's contempt order stated, "The failure to follow the order was intentional. . . . When this person did not obey the parenting/custody order, s/he . . . acted in bad faith." CP at 722 (boldface omitted). The findings are sufficient.

*Subsection 14b: Our Family Wizard*

Paragraph 14b of the parenting plan, with Judge Kirkendoll's handwritten modification, provides in relevant part:

14. Other
. . . .
b. Communication Between Parents. The parents shall communicate regarding the children via www.ourfamilywizard.com. The parents shall thereafter conduct all communications regarding shared parenting matters using the website's features. The parents will utilize the calendar feature in Our Family Wizard. This means that all schedules pertaining to the children's therapy, medical apts, school and activities shall be loaded onto the calendar.

CP at 497 (boldface and underlining omitted). In moving for findings of contempt, Mr. DiLorenzo said:

Despite several requests by myself and my lawyer to be updated of the children's appointments and schedules, and for Patty to upload information on the [Our Family Wizard] calendar, Patty has refused/failed to use the calendar feature, at all, until after our failed mediation session on 11/16/18. Otherwise, I have not been advised in advance of appointments for the children.

CP at 663.  He said that after the failed mediation and notice to Ms. Bell that he would be filing a motion for contempt, she did upload two appointments (appointments to which she knew he objected).

At the revision hearing, the trial judge said it could find no response from Ms. Bell to this alleged failure to comply.  It invited her lawyer to point out any response, but none was identified.

Ms. Bell argues she cannot willfully violate the calendaring provision because subsection 14c of the parenting plan requires each parent to "be responsible for keeping advised of school, athletic, and social events in which the children participate" and gives each parent "full and equal access to education and health care records."  CP at 497-98.  It requires each parent to input into Our Family Wizard any information the other parent cannot get directly from the school, doctor or counselor's office.  Ms. Bell argues that since Mr. DiLorenzo can contact providers and schools to find out whether she has made appointments for the children, her failure to load them when made cannot be a violation.

We will not find ambiguity in a reading of section 14 that is absurd.  No reasonable reader would believe that the simple task of posting an appointment when Ms. Bell makes one is excused because Mr. DiLorenzo is authorized by subsection 14c to hound providers and schools, repeatedly, for updates on what has been scheduled by Ms. Bell.

*Subsection 14a: Skype assistance*

With Judge Kirkendoll's handwritten modification, subsection 14a of the

agreement provided in relevant part:

> 14. Other
>     At this age the children need physical assistance with technical communication; however the goal as they get older is
> a.  Unmonitored Communication Between Children and Parents. The parents shall promote unimpeded and unmonitored contact with the other parent via telephone or Skype at reasonable times. At a minimum, each parent shall have telephone or Skype contact with the children one time when the residential time with the other parent is more than 4 overnights.

CP at 497 (boldface omitted). When the parenting plan was entered, Judge Kirkendoll

explained:

> What I'm saying is I think at this point they need assistance. Somebody's got to turn it on. Somebody's got to hold it. Somebody's got to direct their attention. But when they're old enough to hold this themselves, they should be able to talk to their mother in private and talk to their father in private.

RP (May 30, 2018) at 1037.

In his motion for contempt, Mr. DiLorenzo said:

> Patty has been increasingly deficient in ensuring there is proper adult facilitation for my Skype calls - namely, for the last several fortnightly sessions, there have been times where the camera has been turned off for a lengthy period of the call or where some sort of toy or other object was blocking the screen, despite my several verbal requests to the [S]kype facilitator to unblock the screen. My sessions have had to become shorter and shorter due to the fact that the [sic] I cannot see my children, nor can

24

> they see me . . . . While I understand my children are young and may not have long attention spans when it comes to Skyping, for the last several sessions, at least, I have seen no indication of any adult attempting to step in to keep the calls on track. It is as if an iPad is thrown onto a playroom floor and the children are left in the room alone to do what they want with it.

CP at 662-63. Ms. Bell's declaration in opposition did not address the Skype facilitation issue. She did say, in connection with other matters, that the parties' sons were ages 3 and 2 and that both were developmentally delayed.

The trial court stated at the hearing that there was nothing in Ms. Bell's opposition declaration that addressed this failure to follow the parenting plan. Again, Ms. Bell's lawyer could point to nothing submitted in response. On appeal, Ms. Bell argues for the first time that the provision is "problematic" because "[i]t does not require any specific conduct" and states goals that are in opposition: assistance with the call, but no monitoring of the call. Br. of Appellant at 35. We find no ambiguity but here again, the argument need not be considered, since it was never raised in the trial court.

IV. REQUESTS FOR ATTORNEY FEES AND COSTS ON APPEAL

Mr. DiLorenzo requests an award of attorney fees and costs on appeal under either RCW 26.26.140, or RAP 18.9. Former RCW 26.26.140 (1994), now codified at RCW 26.26B.060, deals with parentage proceedings and does not apply.

RAP 18.9 authorizes an award of fees to a party required to respond to a frivolous appeal. An appeal is frivolous if the court is convinced that it presents no debatable issues on which reasonable minds could differ and is so lacking in merit that there is no

No. 37359-2-III
*Bell v. DiLorenzo*

possibility of reversal. *In re Marriage of Foley*, 84 Wn. App. 839, 847, 930 P.2d 929 (1997). A civil appellant has a right to appeal under RAP 2.2, and all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant. *See Streater v. White*, 26 Wn. App. 430, 434-35, 613 P.2d 187 (1980). We do not find Ms. Bell's appeal to have been frivolous in its entirety.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Korsmo, A.C.J.

26