IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of<br><br>SATOMI NAKAMURA,<br><br>      Respondent/Cross Appellant,<br><br>  and<br><br>AKIHIRO NAKAMURA,<br><br>      Appellant/Cross Respondent. | No. 84133-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Satomi and Akihiro Nakamura challenge the trial court's categorization of property and enforcement of a separation agreement in the dissolution of their marriage. We agree with Satomi[1] that the trial court properly characterized their Mercer Island home as community property and improperly enforced a Civil Rule (CR) 2A Agreement that provided Akihiro a condominium that otherwise would be community property. We also agree with Satomi that the trial court erred in characterizing a promissory note stemming from the sale of a commercial investment property as Akihiro's separate property when he expressly conceded at trial that any proceeds from that sale were community property. We affirm in part, reverse in part and remand for

_____

[1] Because the parties share the same last name, we refer to the parties by their first names for clarity.

Citations and pincites are based on the Westlaw online version of the cited material.

reconsideration of a dissolution order consistent with this opinion.

FACTS

In 1991, four years before Akihiro Nakamura met his future wife, he purchased a commercial investment property on Maynard Way in Seattle. Akihiro met Satomi in Japan in 1995. Akihiro lived in the United States at the time. The two began a long-distance relationship before Satomi moved to the United States in 1999. The two married in September 2000. During their marriage, Akihiro made all the financial decisions in what the trial court described as "stereotypical marriage of, perhaps, yesteryear," including decisions regarding businesses, loans and bank accounts. [2] The couple moved into a condominium on Mercer Island shortly before having their first child in 2004.

The parties dispute whether the down payment for the condominium was a gift or a loan from Akihiro's parents. Akihiro's parents provided the couple $180,000 for the down payment and Akihiro and Satomi together obtained a mortgage for the remainder of the $284,000 purchase price. Akihiro testified that he borrowed the down payment from his parents, as reflected in a Japanese notarized promissory note between Akihiro and his parents. Satomi testified that Akihiro's father told her the money was a gift to the couple. Akihiro has never attempted to repay it in whole or in part.

Akihiro was not working at the time they purchased the condo. Satomi has largely stayed at home since their first child was born. Satomi had no control over the

---

[2] The trial court incorporated its oral findings and conclusions issued on March 11, 2022 into its written findings and conclusions about the Marriage. Satomi does not challenge any of the court's findings in her cross appeal. Akihiro does not substantively challenge the court's findings of fact other than challenging the characterization of what is separate or community property.

family's finances, as Akihiro made all financial and budgeting decisions for their family. Satomi had a credit card in her name which she used to pay for food, incidentals, and the children's activities.

In 2007, Akihiro sold the Maynard Way property and used the funds to buy another commercial property on East Marginal Way, also in Seattle. The purchase was completed through a "1031 exchange."[3] The warranty deed for the property listed the grantors as both Akihiro and Satomi as "husband and wife." Akihiro testified that he "had no choice" but to turn the Maynard Way property into "community property" in order to get a loan from the bank.

In 2009, around the time they had their second child, Akihiro decided to purchase Fuji Cake, later renamed Fuji Bakery, in Seattle. The bakery property is unrelated to the East Marginal Way property. Satomi helped out at the bakery for a short time after it opened. The bakery barely broke even. In 2012, Akihiro wanted to expand the bakery and open a second location. Akihiro testified that in July 2012, his parents sent over a total of $1.2 million to fund the expansion. To support his claim that the $1.2 million was a loan from his parents, he submitted two Japanese notarized promissory notes and one document titled "Loan" where Akihiro agreed to pay his parents back beginning in

---

[3] In a 26 U.S.C. § 1031 exchange, a taxpayer realizes no taxable gain upon the exchange if the property held for productive use is exchanged for like-kind property. Section 1031 is an exception to the general rule requiring recognition of gain or loss when property is sold or exchanged. State v. Grimes, 111 Wn. App. 544, 548, fn 1, 46 P.3d 801 (2002).

2015.[4]  These loans totaled 107,774,200 yen.[5]  Whether this money was a loan or a gift was disputed at trial.  Akihiro testified that this money was a loan to him from his parents that he had to pay back.  According to Akihiro, the money was used for the expansion of Fuji Bakery through a $731,037.50 loan and a $500,000 loan from Akihiro to Show Tatsu, LLC, the food service restaurant business whose governors were Akihiro and Satomi.[6]

Satomi testified that Akihiro's parents "often" gifted the family funds that they used to pay for living expenses.  Satomi said Akihiro told her that his parents had gifted them 120 million yen that he never planned to repay.  Satomi also said Akihiro's parents told Satomi the money was a gift and did not expect to be repaid.[7]  At the time of trial, Akihiro had made no payments to his parents for the loans and asserted that he and his parents had a verbal agreement to not repay the loans because of the pandemic and that he would repay it when various properties sold.  The trial court did not find this

---

[4] The two "Notarized Loan Agreement[s]" were for 29,116,800 yen and 19,411,200 yen borrowed on May 1, 2012, and for 12 million yen borrowed on June 19, 2012. The terms of the notes required repayment at .1 percent interest starting the last day of April 2015.  If the borrower misses a deadline, interest increases to 6 percent.  The "Loan" document listed four different amounts borrowed between September 27, 2012 and December 13, 2012 for a total of 47,246,200 yen.  This document was not notarized and had different terms.  The loan was interest-free with payment to begin last day of January 2015.  If borrower was late on a payment, the principal and interest, which rate was not identified, would be due at once. All the documents were written in Japanese and were translated for trial.

[5] The record did not include the value of the yen in United States dollars at the time the loans were received.  According to the United States Treasury, 107,774,200 yen equates to $745,223.34 on June 30, 2023.  https://fiscaldata.treasury.gov/currency-exchange-rates-converter/.

[6] The relationship between Show Tatsu and Fuji Bakery is not altogether clear.  Fuji Bakery Inc. is listed as the company in tax returns, yet Akihiro's testimony suggested that Show Tatsu owned Fuji Bakery.  Regardless, the parties do not dispute that Fuji Bakery, a business started during the marriage, was community property.

[7] Although Akihiro had previously objected to the introduction of his parents' statements to Satomi about the funds being gifts, he failed to object to this statement during Satomi's testimony.

4

testimony credible.  The trial court found the "vast majority" of Satomi's testimony to be credible.

In 2014, Akihiro was diagnosed with cancer and returned to Japan for approximately one year to receive treatment.  During that time Satomi remained in the United States with the couple's children and took over the administrative tasks at the bakery, while Akihiro managed the accounting and instructed employees through video calls.  They each earned a modest salary during this time.[8]  After returning from treatment, Akihiro began to make unilateral decisions for the family.

In October and November 2017, Akihiro sold the East Marginal Way property and the bakery.  The proceeds from both sales were deposited into the Nakamuras' joint account.  Akihiro sold the East Marginal Way property for $1.2 million in October 2017.  After closing, Akihiro received approximately $582,000 in cash and a later payment of $425,000 for the sale, along with a promissory note to pay the remaining $75,000.[9]  About $1.39 million in proceeds from the sale of Fuji Bakery were deposited into the joint account in November.[10]  After the bakery sold, the Nakamuras did not earn any income other than interest income.[11]

The parties, during trial, stipulated on how the money from the sale of the bakery and the East Marginal Way property were distributed.  The parties do not challenge the trial court's finding that

---

[8] According to their W-2 tax statements, in 2016, Akihiro earned about $35,000 at the bakery and Satomi earned about $26,000.

[9] The $75,000 was part of a holdback provision related to environmental cleanup of the site.

[10] The deposits were for $161,687.48, $500,000, and $731,037.50.  The money from the sale of the bakery was used to pay off the loans from Show Tatsu to Akihiro.

[11] According to their joint tax return, income interest grew from $36,745 in 2017 to $70,433 in 2019.

tracing shows that the money that was transferred from the respondent's parents to the respondent was used fairly quickly to fund business entities, then, when those entities were sold, whether they be real property or business entities, the money was then transferred back to the respondent, not to his parents, and was used for personal expenses.

The day after the proceeds from the sale of the bakery were deposited, Akihiro made four separate $400,000 withdrawals. The same day, Akihiro created one certificate of deposit (CD) for $400,000 in his name. He started another $400,000 CD in Satomi's name. Two days later, Akihiro used $328,000 from the joint bank account to pay off mortgages on the Mercer Island condominium. The parties agree that Akihiro also had created two more $400,000 CDs which, later in July 2019, he deposited back into the joint account as two separate deposits of $408,179. The next day, Akihiro wrote himself a check for $815,000 and, the same day, created an $800,000 CD in his name. The remainder of the proceeds were used to pay for the family's living expenses because Akihiro did not return to work after his cancer treatment. The parties stipulated that Akihiro's $400,000 and $800,000 CDs were proceeds that originated from the sale of the bakery and the $400,000 CD for Satomi originated from the sale of the East Marginal Way property.

According to Satomi, the parties first began talking about ending the marriage around November 2017. Satomi testified that it was in this context that Akihiro transferred $400,000 to Satomi and said, "I'm giving this to you." Satomi presented Akihiro with a "rikon todoke,"[12] a Japanese divorce document, in 2018. Akihiro testified

---

[12] A "rikon todoke" is a document used to register a divorce with the Japanese local government. In Japan, to obtain a divorce, the parties "simply affix their seal" to the rikon todoke and submit the document to the local government office. Colin P.A. Jones, In the Best Interests of the Court: What American Lawyers Need to Know about Child Custody and Visitation in Japan, 8 ASIAN-PAC. L. & POL'Y J. 166, 205 (2007).

that he believed the first discussion of divorce was around the same time as Akihiro's purchase of a Mercer Island house in 2019. Both filled out the rikon todoke paperwork but never finalized it and decided to stay together.

Satomi first learned about Akihiro buying the Mercer Island house from their daughter and a call from the loan officer eight days prior to its closing. While still married, Akihiro had begun the purchase of a $1.2 million house on Mercer Island. Akihiro testified that he intended the purchase to be his as a separate estate. Satomi was very concerned about the couple's ability to pay for the purchase as neither were working at the time.

Akihiro's Japanese-speaking realtor, Munetsugu Yokobe, spoke to Satomi several times by phone and in person to discuss her concerns before the sale closed. Yokobe explained to Satomi that Akihiro requested she sign a quitclaim deed for the property to relieve her of any liability for the property or payment on the loan used to purchase the property. Yokobe explained that the quitclaim deed would make her not liable for the purchase and told her the house belonged to Akihiro because it was being paid for with his money. Eight days prior to closing Akihiro had Yokobe pick up Satomi and drive her to an office to sign a quitclaim deed. No translator was present at the signing and Yokobe did not translate the documents for Satomi before signing. Yokobe said he did not provide any legal advice and did not understand at that time that the quitclaim deed may prejudice her if the couple's marriage dissolved.

The trial court found Satomi credibly testified that she spoke limited English. She often used a dictionary to translate documents written in English and required time to translate and understand documents. Satomi testified that she was "shaking" and

7

"crying" before ultimately signing the quitclaim deed to the Mercer Island house. She also testified that she did not understand that she could potentially be giving up some interest in real estate because she was told it was Akihiro's house.

Akihiro purchased the house using the $400,000 CD that had grown to $410,000 and $800,000 in his name as collateral to obtain a $1.21 million loan. Satomi was not present for the closing.

After the entire family moved into the home in 2019, Akihiro asked Satomi to sign a loan using the condominium as collateral. When Akihiro refused to tell Satomi what the loan was for, she refused to sign. They argued and in early February 2020 discussed a separation agreement, much of which was negotiated through a Japanese language messaging application called LINE.[13]

In the negotiations, Satomi agreed to sign the mortgage on the condo and Akihiro agreed to allow Satomi and the children to live in the condominium rent-free for three years beginning on March 1, 2020. The signed CR 2A Agreement, prepared by Akihiro's attorney, was in English except for the hand-written addition added by Akihiro in Japanese that stated Akihiro would vacate the house and allow Satomi to live there for the agreed three-year time period if Akihiro fell into arrears on the condo mortgage payments causing Satomi to have to move out.

During the negotiations, Satomi explained the context of what she was asking for in regards to the condo.

> 11:51 PM    [Satomi]    First of all, I don't want to be misunderstood, so let me write what I don't want.

---

[13] The messages were translated into English for trial.

11:53 PM    [Satomi]    Since Mercer's condominium is yours, when you sell it someday and make a profit, naturally, I will not even get a penny.

11:54 PM    [Satomi]    I don't even want to have that kind of money, so first, I'll indicate that.

11:56 PM    [Satomi]    So, I am aware that when I receive CD money under my name is when I lose my ownership of the Mercer condominium.

11:57 PM    [Satomi]    Please be assured that I am far from wanting to get both CD money and profits from buying and selling the condominium.

11:58 PM    [Satomi]    After clearly stating that, I would like to write my wishes regarding the Mercer condominium.

Akihiro explained that he had planned to sell or remortgage the condominium to pay for the education of their children. The parties also discussed the benefits of remaining together in the home because their children were still in school but acknowledged that they could still, within a month, end up back to where they started, break up and live separately.

Satomi signed the CR 2A Agreement without consultation of an attorney. She depended on Akihiro to explain to her the meaning of "finance" and "refinancing" on the day of signing and by looking up words in a dictionary. The agreement stated that the parties "agree that this is a settlement containing the terms for distribution of the Condo that they are both on title." It also stated that the "consideration for this agreement is the mutual exchange of promises and releases herein." Under the agreement's recitals, it said the "parties desire for Satomi Nakamura to transfer her ownership interest in the Condo to Akihiro Nakamura in order to complete a refinance and for purposes of dividing up their various assets." It also stated the parties "also desires that Satomi

shall have the right to possession of the Condo for three years from the date of this agreement; after that three years, she must surrender possession of the Condo to Akihiro." The agreement listed the terms of Satomi living in the condo for three years, but made no mention of obtaining a loan on the condo or a $400,000 CD. The terms also stated that "[a]t the time of this Agreement, Satomi will sign the Quit Claim Deed for the Condo, signing over any interest that she may have in it to Akihiro." Akihiro signed the agreement on February 24, 2020. Satomi signed the next day. That same day, the parties closed on a $417,000 loan on the condo. There is no record of Satomi signing a quitclaim deed related to the condo.

Akihiro took more than $230,000 of the loan and deposited it into a Robinhood brokerage investment account that was only in his name. The rest was spent on living expenses. Akihiro used money from the Robinhood account to open Top Velocity Northwest, LLC, a baseball practice facility.[14] Without consulting with Satomi, Akihiro gave 99 percent of the Top Velocity business to their son. Akihiro continued to loan money to Top Velocity despite the fact the business did not make money.

On September 16, Satomi moved out of the home and into the family's condo. The trial court found that Akihiro "essentially he kicked [Satomi] out of the house with literally only the clothes on her back and canceled her access to joint funds." She filed a petition for dissolution in November.

The case proceeded to trial in February 2022. No financial expert testified which made it particularly difficult for the trial court. A central issue at trial was whether the funds from Akihiro's parents were a loan or a gift and whether the CR 2A Agreement

---

[14] Akihiro opened Top Velocity because his son and his friends had no place to practice baseball during the pandemic.

was valid.  Also at issue was whether separate assets were traceable.  In closing,

Akihiro's counsel conceded that, although Akihiro bought the Maynard property before

he and Satomi married,

> at some point after the marriage it was transformed to community property
> when he took out a mortgage.  That property was sold in 2007, and the
> Marginal Way property was bought in a 1031 exchange in 2008.
>      In October 2017, the parties sold the Marginal Way property and
> received $582,652.28.  They also received a $500,000 promissory note,
> which had a $75,000 holdback.  We do not dispute that the cash received
> and the promissory note for the Marginal Way property were community
> property.

Akihiro also acknowledged in closing that the $400,000 CD given to Satomi was bought

with community funds.  At the same time, he argued that the condo was Akihiro's

separate property "because of the CR 2A where Ms. Nakamura received the $400,000."

Akihiro also argued that the $410,000 and $800,000 CDs were his separate property

traceable to loans to him from his parents.  He maintained that the house was

purchased based on those loans as collateral and with Satomi's understanding that it

was purchased as Akihiro's separate property and that the quitclaim deed Satomi

signed over to Akihiro was "done out of an abundance of caution" but not necessary.

Satomi argued that the funds from Akihiro's parents were gifts to the community

and that the CR 2A is a half-baked agreement that failed to address other assets,

maintenance, child support and parenting, and was unfair at the time of the signing.

Satomi contended that both the condo and house were community property and

proposed dividing the assets evenly.

The trial court did divide the assets evenly, but found that the CR 2A Agreement

was valid and the condominium was the separate property of Akihiro in accordance with

the agreement, that the $400,000 certificate of deposit from the sale of the East

Marginal Way property was the separate property of Akihiro, and that the funds transferred from Akihiro's parents were gifts to the community, making the Mercer Island house community property. The court also awarded the $75,000 promissory note as Akihiro's separate property.

Akihiro appeals and Satomi cross-appeals.

DISCUSSION

Mercer Island House

Akihiro argues that because the Mercer Island home was purchased based on collateral that was the $1.2 million loan to him from his parents, the house also should be considered his separate property. He contends that the $1.2 million loan to him that was used to expand Fuji Bakery was traceable separate property through the loans from himself to the Bakery and back again when the Bakery sold and the money was placed into three $400,000 CDs that eventually became one $410,000 CD and one $800,000 CD. Satomi contends the trial court correctly characterized the home as community property because the money used to purchase the home was community property. Money from Akihiro's parents were gifts, not loans, to the family and used for the community business and family expenses.

The trial court is required to characterize property before it as either community or separate property in performing its obligation to make a just and equitable distribution of properties in a marriage dissolution action. Marriage of Kile and Kendall, 186 Wn. App. 864, 875, 347 P.3d 894 (2015) (citing Marriage of Gillespie, 89 Wn. App. 390, 399, 948 P.2d 1338 (1997)). Property status is determined "as of the date of its acquisition." Id. "All property acquired during a marriage is presumptively community property,

regardless of how title is held." Id. at 876 (quoting Dean v. Lehman, 143 Wn.2d 12, 19, 18 P.3d 523 (2001)); RCW 26.16.030. "'The burden of rebutting this presumption is on the party challenging the asset's community property status, and can be overcome only by clear and convincing proof that the transaction falls within the scope of a separate property exception.'" Kile, 186 Wn. App. at 876 (internal quotation marks omitted) (quoting Dean, 143 Wn.2d at 19-20).

An asset is separate property if "acquired before marriage; acquired during marriage by gift or inheritance; acquired during marriage with the traceable proceeds of separate property; or, in the case of accumulations, acquired during permanent separation." Marriage of Schwarz, 192 Wn. App. 180, 188-89, 368 P.3d 173 (2016) (citing Marriage of White, 105 Wn. App. 545, 550, 20 P.3d 481 (2001)); RCW 26.16.010. While a gift to one spouse is the separate property of that spouse, a gift to a married couple is presumed to be community property. Marriage of Martin, 32 Wn. App. 92, 96, 645 P.2d 1148 (1982). This presumption can be rebutted by clear and convincing evidence that the property is separate. Id. (citing Beam v. Beam, 18 Wn. App. 444, 452, 569 P.2d 719 (1977)).

A trial court's characterization of property as separate or community presents a mixed question of law and fact. Kile, 186 Wn. App. at 876 (citing Martin, 32 Wn. App. at 94). We review the findings of fact supporting the trial court's characterization for substantial evidence. Id. (citing Marriage of Mueller, 140 Wn. App. 498, 504, 167 P.3d 568 (2007)). The ultimate characterization of the property as community or separate is a question of law we review de novo. Id. (citing Mueller, 140 Wn. App. at 503-04).

Because Akihiro challenges the trial court's characterization of the home as

community property, he is required to prove by clear and convincing evidence that it was purchased with his separate property.

Akihiro argues that Satomi stipulated that the $410,000 and $800,000 CDs were separate property traceable to the $1.2 million loan to Akihiro from his parents.[15] Akihiro misstates the record. That was not the stipulation, despite the appellant counsel's repeated attempts to convince this court otherwise in briefing and at argument. Satomi stipulated only that the $1.2 million from the payoff of the full reconveyance from the loan from Akihiro to the bakery was put into the Nakamuras' joint account, which was later put into CDs.[16] There was no stipulation that Akihiro

---

[15] Wash. Court of Appeals oral argument, Marriage of Nakamura, No. 84133-5-I (July 21, 2023), at 4 min., 21 sec. through 7 min., 20 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2023071137.

[16] The relevant portion of the trial transcript reads

| | |
|---|---|
| THE COURT: | I'm going to pause for just a second here. Mr. Lovelace [Akihiro's counsel], is the intent of all these different financial exhibits to show that the money went into CDs and where it came from and where it went to through different bank accounts? |
| MR. LOVELACE: | Yes, your honor. It's to show the tracing of the accounts. |
| THE COURT: | Is that something that's disagreed with or objected to in any way, Mr. Cespedes [Satomi's counsel]? Not the fact of the admission, but the fact that the money ended up in CDs and has been in different bank accounts. |
| MR. CESPEDES: | It's not disputed. |
| THE COURT: | Is there a potential for a stipulation to eliminate a lot of this testimony? |
| MR. CESPEDES: | I would agree if it is a reasonable stipulation. |
| MR. LOVELACE: | Well, okay. The purpose of this is to show that the 1.2 million from the payoff of the full reconveyance from the loan from Aki, from Mr. Nakamura, to the bakery was put into the joint account, which was immediately put into CDs. One CD stayed as a CD, two CDs came back, and then those were used to put it through to Mr. Akihiro's regular account, which was then put into a CD as the collateral for the loans used to buy the house. |
| THE COURT: | Do you agree with that, Mr. Cespedes? |
| MR. CESPEDES: | Yes. |

received $1.2 million in loans from his parents, nor that any funds received were Akihiro's separate property.

Satomi testified that his parents "often" sent funds to Akihiro and that the family was "living off of those funds," which Satomi understood were gifts. They had also provided the down payment for the condo as a present. Satomi testified that she was told by Akihiro that his parents had transferred money to help expand the bakery, but she did not know the specific amount. Satomi instead testified that Akihiro specifically told her that he was not going to return the money to his parents. She also explained that when she was in Japan and visiting Akihiro's parents, the parents told her that the money was a gift. She explained that she did not have a clear understanding of what the transactions were and only knew what her husband told her. At some point Satomi believed Akihiro's parents had gifted them 120 million yen. When Fuji Bakery sold, she suggested to Akihiro he send some money to his parents to show their appreciation. Akihiro did not send any money to his parents.

Akihiro testified that the funds from his parents were loans and presented two "Japanese notarial bonds" and a document called "Loan" to support his claims that he borrowed money from his parents. The notarized notes required payment to begin the end of April 2015 at .1 percent interest that would jump to 6 percent for late payment. The interest-free loan required payment at the end of January 2015 or the entire principal and interest would be due at once. Akihiro conceded he has never made a payment. Nothing in the record established that his parents made any attempt to collect on the outstanding loans. Akihiro explained that his parents later verbally agreed to

---

THE COURT:      Okay.  You have a stipulation.

give him an extension because he said he could not pay. He said he could not get the verbal agreement reduced to writing because he was unable to return to Japan because of the pandemic. The trial court did not find this testimony to be credible. Akihiro's parents did not testify despite the fact the trial was held on Zoom.[17]

The trial court did, however, find Satomi's testimony to be credible.

> She stated a number of things, the vast majority of which I found to be credible.
> She indicated that the respondent had told her that he had no intention of paying back the loans that came from his parents, that he exerted a lot of financial control throughout the marriage, that he threatened to discuss the divorce with the children at times, that essentially he kicked her out of the house with literally only the clothes on her back and canceled her access to joint funds, that he made the financial decisions during the marriage, as would be expected in a stereotypical marriage of, perhaps, yesteryear, including regarding businesses, loans, Top Velocity bank accounts, etc.
> The petitioner credibly testified that she speaks limited English, not that she doesn't speak any English, but that her English is limited, which affects her ability to work to some degree.
> . . . .

Most of the petitioner's points were not rebutted and were agreed to. Nothing in the record established where or how the funds from Akihiro's parents were initially deposited and how those specific funds were spent. Satomi testified that she recalled Akihiro said his parents gifted them 120 million yen, an amount significantly greater than the claimed loans that totaled 107,774,200 yen. The court found that "money that was transferred from" Akihiro's parents was used to "fund business entities" and when they were sold, the money was "used for personal expenses." The court did not find that Akihiro's parents loaned him $1.2 million as separate property.

After Fuji Bakery sold, the proceeds from that sale were deposited into the

---

[17] Zoom is a cloud-based video-conferencing software platform.

16

Nakamuras' joint account. Akihiro did not make any payments on the loans and instead took out a loan to start a business during a pandemic.

Considering the trial court's credibility determinations and the record, evidence supports the trial court's finding that the funds from Akihiro's parents were gifts to the community. The house was purchased during the marriage based on collateral that were proceeds from the sale of Fuji Bakery, a community business. That community business was expanded with the assistance of community gifts from Akihiro's parents.

Akihiro also asserts that Satomi "disavowed any interest in the Mercer Island home by signing a quitclaim deed." The trial court apparently gave little credence to the quitclaim deed and neither do we. The "name on a deed or title does not determine the separate or community character of the property, or even provide much evidence." Estate of Borghi, 167 Wn.2d 480, 488, 219 P.3d 932 (2009). Moreover, the circumstances surrounding how Akihiro obtained the quitclaim deed are disturbing. Satomi, who feared being saddled with debt the couple could not afford, signed the quitclaim deed presented by Akihiro's real estate agent who told Satomi that she did not have an interest in the house because Akihiro bought it with his own money, which was not an accurate.

We conclude that Akihiro has not met his burden to rebut the presumption that the house was community property.

### Promissory Note

Satomi argues on cross-appeal that the trial court erred in characterizing the proceeds of the sale of the commercial property on East Marginal Way as Akihiro's separate property. She contends that because of this error the $75,000 promissory

note from the sale was wrongly characterized by the trial court as separate property as well.

An asset that was acquired by a spouse prior to the marriage or acquired during the marriage with funds with the traceable proceeds of separate property is considered separate property. RCW 26.16.010. Although property is characterized as of the date of its acquisition, the date alone is not dispositive. Marriage of Sedlock, 69 Wn. App. 484, 506, 849 P.2d 1243 (1993). Property that would ordinarily be categorized as separate property may be converted to community property by virtue of an agreement or an examination of whether it was "acquired by community funds and community credit." Sedlock, 69 Wn. App. at 506; Marriage of Schweitzer, 132 Wn.2d 318, 324, 937 P.2d 1062 (1997).

Akihiro purchased a commercial investment property on Maynard Way in Seattle's Pioneer Square in 1991, prior to the marriage. However, this separate property was subsequently converted to community property. Akihiro testified that he added Satomi's name in the deed and loan application in order to obtain funding for the purchase of the new property on East Marginal Way. Although Akihiro testified that he "had no choice" in turning his separate investment property into "community property," he never took the position that the investment property or its proceeds were separate property during trial. During closing, Akihiro's counsel explained that, although Akihiro bought the Maynard property before he and Satomi married,

> at some point after the marriage it was transformed to community property when he took out a mortgage. That property was sold in 2007, and the Marginal Way property was bought in a 1031 exchange in 2008.
> In October 2017, the parties sold the Marginal Way property and received $582,652.28. They also received a $500,000 promissory note, which had a $75,000 holdback. We do not dispute that the cash received

18

and the promissory note for the Marginal Way property were community property.

Akihiro never claimed the $75,000 promissory note was his separate property at trial. The evidence did not support the trial court's finding that the proceeds from the sale of the East Marginal Way property was Akihiro's separate property. We hold that the $75,000 promissory note is community property and that the trial court erred in awarding that promissory note to Akihiro as his separate property.

<u>CR 2A Agreement</u>

Spouses may enter into a separation agreement providing for the "disposition of any property," including changing the status of property from community into separate property. RCW 26.09.070(1); <u>Parentage of G.W.-F.</u>, 170 Wn. App. 631, 638, 285 P.3d 208 (2012). Courts seek to "promote the amicable settlement of disputes" rather than "adversarial resolution of property." RCW 26.09.070(1); <u>Marriage of Shaffer</u>, 47 Wn. App. 189, 193, 733 P.2d 1013 (1987). Separation agreements are binding unless the court finds evidence that the contract was "unfair at the time of its execution." RCW 26.09.070(3). The trial court cannot disregard a separation agreement for not conforming to the court's view of an equitable distribution. <u>Shaffer</u>, 47 Wn. App. at 193-94. However, the courts do consider if the agreement was executed unfairly. <u>Id.</u> RCW 26.09.070(3) requires courts to consider "the economic circumstances of the parties" and "evidence of the parties' economic circumstances is relevant only insofar as it pertains to the issue of whether both parties were fully informed about the extent of their property, received independent advice about their rights, and entered the agreement voluntarily." <u>Id.</u> at 195.

In deciding whether a separation agreement was unfair at the time of execution,

the trial court considers (1) whether the parties fully disclosed the amount, character, and value of the property, and (2) whether the agreement was entered into fully and voluntarily on independent advice and with full knowledge by the spouse of her rights. Id. at 194 (adopting the test outlined in Marriage of Cohn, 18 Wn. App. 502, 506, 569 P.2d 79 (1977)). The court may consider in its evaluation the "economic circumstances of the parties and any other relevant evidence produced by the parties." RCW 26.09.070(3).

The trial court did not conduct the proper analysis. Instead of analyzing the procedural fairness at the time the parties entered into the agreement, the court focused on whether Satomi's receiving of a $400,000 CD and three-years rent-free access to the condo was a fair exchange for giving up her interest in the condo.

Satomi claims that she was unaware of her rights to the condominium and that she was unaware that by entering the separation agreement she would be waiving any interest in the condo in exchange for the $400,000 certificate of deposit she had received two years earlier. The evidence presented at trial shows that Satomi had some understanding of the agreement she was making and was aware both that she had an ownership interest in the condominium and that she was giving up that interest in the interest of getting the certificate of deposit. However, there is no indication that she was aware that the $400,000 CD "given" to her by Akihiro was community property and not Akihiro's separate property. Nor is there any evidence that she was aware of what the value of the condo was at the time she received the CD or at the time she signed the CR 2A Agreement.

More importantly, Satomi entered the agreement without "independent advice."

20

The agreement was drafted in English by Akihiro's attorney. Satomi testified that she did not have an attorney review the agreement. She had to use a dictionary to try to understand the document. When she had questions, she would depend on Akihiro to provide the answers. For example, the CR 2A Agreement stated that the "parties desire for Satomi Nakamura to transfer her ownership interest in the Condo to Akihiro Nakamura in order to complete a refinance and for purposes of dividing up their various assets." Satomi told Akihiro, "I'm ignorant and don't really understand the meaning of finance and refinancing, so it would be helpful if you could explain it verbally on the day of signing." Sometimes she did not get an answer to a question. During discussions about the agreement, Satomi messaged Akihiro, "Sorry. I have a question. 'Conditionally, if there is nothing happening for 3 years, please agree to sell', but when will I be removing my name from the ownership of the Mercer condominium? Is it coming soon? or 3 years later?" Akihiro responded, "Don't worry about it."

Satomi testified that during her marriage she was told "many, many times was that as far as money was concerned, money belonged to Mr. Nakamura. It belonged to the Nakamura family only." Satomi testified that she thought that once they divorced, she would have no rights as far as the money, children, and living location were concerned. She said she had no idea how the CR 2A Agreement would impact her financially in a dissolution.

Akihiro asserts that this court should apply the "two prong test" outlined in G.W.-F., 170 Wn. App. at 638; Marriage of Matson, 107 Wn.2d 479, 730 P.2d 668 (1986), which directs a court to first evaluate the substantive fairness of an agreement then to evaluate the procedural fairness only if it was substantively unfair. This test however,

21

applies to prenuptial and postnuptial agreements, like those at issue in G.W.-F. and Matson, rather than separation agreements. The court's evaluation of a separation agreement is instead guided by statute, RCW 26.09.070(3) which instructs the court to evaluate the fairness at the time of execution and does not direct the court to consider substantive fairness. The CR 2A Agreement, as drafted by Akihiro's attorney, was a "settlement" agreement establishing the terms of "distribution" of the condo. It was entered into in the context of the couple separating.

Because the record establishes that the CR 2A Agreement was unfair at the time of execution, we hold that the trial court erred in finding that the CR 2A Agreement was valid and enforceable requiring the court to assign the condo as Akihiro's separate property.

Attorney Fees on Appeal

Satomi requests attorney fees on appeal under RCW 26.09.140, RAP 18.1(a). Under RCW 26.09.140, this court has the discretion to order a party to pay for the reasonable attorney fees and costs incurred by the other party in a marital dissolution. We consider the parties' financial resources as well as the merit of the issues presented on appeal. Marriage of C.M.C., 87 Wn. App. 84, 89, 940 P.2d 669 (1997). Satomi complied with RAP 18.1(b) by presenting argument with merit, properly requesting fees in her brief, and complied with RAP 18.1(c) by filing an affidavit of financial need at least 10 days before oral argument.

Akihiro submitted his own financial affidavit just two days prior to oral argument. To allow this court to consider the financial resources of the parties, RAP 18.1(c) states that "each party must serve upon the other and file a financial affidavit no later than 10

22

days prior to the date the case is set for oral argument or consideration on the merits." Generally, strict compliance with RAP 18.1(c) is required. Donovick v. Seattle First Nat'l Bank, 111 Wn.2d 413, 757 P.2d 1378 (1988). This court has historically denied an award of attorney fees when the requestor has failed to comply with the requirements of RAP 18.1(c). See Marriage of Leland, 69 Wn. App. 57, 847 P.2d 518 (1993); Johnson v. Johnson, 32 Wn. App. 147, 150, 646 P.2d 152 (1982) (attorney fees on appeal denied as the record was not perfected in accordance with RAP 18.1(c)); Marriage of Crosetto, 82 Wn. App. 545, 918 P2d 954 (1996) (wife not entitled to award of attorney fees on appeal where she failed to file affidavit of financial need within 10 days prior to oral argument). This court has also denied the request when both parties have failed to file the requisite affidavits. See Johnson v. Johnson, 107 Wn. App. 500, 27 P.3d 654 (2001). On the other hand, the court has granted an award of attorney fees where the requestor timely filed the requisite affidavit, but the opposing party did not. Marriage of Mansour, 126 Wn. App. 1, 106 P.3d 768 (2004) (granting attorney fees on appeal where wife presented argument, requested fees in her brief, and filed a timely affidavit of financial need where husband failed to do so).

Following Akihiro's untimely submission, Satomi moved to strike the affidavit. Akihiro filed a response asking this court to deny the motion to "promote a just decision on the merits." Akihiro provided no explanation for the delay, noting only that the court should consider the affidavit "even if some technical misstep occurred" because his late filing caused "no prejudice."[18]

---

[18] Akihiro fails to explain the "technical misstep" or why RAP 18.1(c) should not apply to him other than "the Court has not yet sat to consider this case – oral argument is in two days – so the Court has sufficient time to compare the current finances."

Akihiro was aware of Satomi's request for attorney fees on appeal more than five months before the scheduled oral argument and chose not to address it in his reply brief, instead waiting to contest the issue until two days before oral argument. In addition, Akihiro failed to comply with the requirements of RAP 18.1(c) by not filing an affidavit of financial need within 10 days of oral argument and waited until two days before oral argument to supply this court with the required filing.

Based on Satomi's affidavit demonstrating need and Akihiro's failure to timely counter with his own affidavit demonstrating an inability to pay,[19] we grant Satomi's motion to strike the untimely affidavit, grant Satomi's request for attorney fees and set the matter before a commissioner of this court for a determination of the appropriate amount. See Mansour, 126 Wn. App. at 17.

CONCLUSION

When a trial court mischaracterizes property, we remand the matter for further consideration when "(1) the trial court's reasoning indicates that its division was significantly influenced by its characterization of the property, and (2) it is not clear that had the court properly characterized the property, it would have divided it in the same way." Schwarz, 192 Wn. App. at 192 (quoting Marriage of Shannon, 55 Wn. App. 137, 142, 777 P.2d 8 (1989)).

We affirm the trial court's characterization of the Mercer Island house as

---

[19] At the end of the trial, the court noted that it was aware at that point that Akihiro did not have a little over a million dollars to make the transfer to Satomi to satisfy the community asset equalizing judgment. The court ordered Akihiro to sell the home if he did not pay half of the judgment of $916,975 within 130 days. However, Akihiro stayed enforcement of the judgment by depositing $1,033,577.30 into the court registry. Satomi made this observation in her request for attorney fees on appeal. Akihiro does not address this fact in his untimely response.

community property, but we reverse the trial court's characterization of the $75,000 promissory note and condo as Akihiro's separate property. At trial, Satomi requested she be given the condo along with the outstanding associated loan so that she would have a place to live. The trial court assigned the condo to Akihiro as separate property because of the CR 2A Agreement, which we conclude is invalid. Thus, the court's division of assets was significantly influenced by the characterization of property and it is not clear that had the court properly characterized all the properties, it would have divided the assets in the same way. For that reason, we remand.

We affirm in part, reverse in part and remand consistent with this opinion.

_Coburn, J._

WE CONCUR:

_Díaz, J._

_Mann, J._